**UNITED STATES of America**

v.

**Osama AWADALLAH, Defendant.**

**No. 01 CR 1026(SAS).**

United States District Court,
S.D. New York.

Jan. 31, 2002.

See, also, 173 F. Supp.2d 186.

Robin Baker, Karl Metzner, Assistant United States Attorneys, United States Attorney's Office, Southern District of New York, New York, New York, for the Government.

Jesse Berman, New York, New York, for Defendant.

### OPINION AND ORDER

SCHEINDLIN, District Judge.

## I. INTRODUCTION

Within days of the September 11th attacks against the United States, the U.S. Attorney's Office in the Southern District of New York and the FBI—working with numerous federal, state and local agencies—initiated a federal grand jury to investigate those attacks. The grand jury was investigating, among other offenses, the crimes of destroying and conspiracy to

destroy aircraft, *see* 18 U.S.C. § 32, bombing and bombing conspiracy, *see* 18 U.S.C. § 844, and seditious conspiracy to levy war against the United States of America, *see* 18 U.S.C. § 2384.

To facilitate the investigation, the government issued subpoenas and warrants calling for material witnesses to testify before the grand jury.[1] On September 21, 2001, a material witness warrant was issued for Osama Awadallah. After Awadallah was detained and held for twenty days in various locations, he testified before the grand jury in New York on October 10 and October 15, 2001.

Three days after Awadallah finished testifying, the government issued a complaint charging him with two counts of knowingly making a false material declaration before the grand jury. *See* Complaint, *United States v. Osama Awadallah*, No. 01 Mag. 1833 (filed October 18, 2001) ¶¶ 1–2 (citing 18 U.S.C. § 1623(a)). Awadallah was arrested on October 21, 2001, and indicted on two counts of perjury on October 31, 2001. *See Awadallah*, 173 F.Supp.2d at 187. Bail with conditions was set on November 27, 2001, *see id.* at 192, and Awadallah satisfied those conditions on December 13, 2001. According to the government, "Awadallah faces a sentence of ten years' imprisonment (the combined statutory maximum on the two counts, pursuant to Section 3A1.4 of the United States Sentencing Guidelines)." 11/20/01 Letter from Assistant United States Attorney ("AUSA") Robin Baker to the Court at 3.

Awadallah now makes several motions related to the perjury charges. *First*, he moves to dismiss the Indictment on the grounds that (1) he properly recanted his false testimony, thereby barring prosecution, (2) the government violated the Vienna Convention on Consular Relations by not informing him of his rights as a foreign national, (3) the government interfered with his right to counsel, and (4) the government denied him due process while holding him in custody prior to his grand jury appearance as well as during his testimony. *See* 12/3/01 Notice of Motion ¶¶ 1–4. *Second*, Awadallah moves to suppress (1) all physical evidence found by law enforcement officers who searched his home, computer and cars, and (2) all statements that he made to any government agent from September 20, 2001 through October 3, 2001. *See id.* ¶¶ 7–8. *Third*, Awadallah moves to dismiss the second count of perjury because it is "immaterial, redundant and duplicative of Count One" and for "[a]n order striking certain prejudicial and improper material from the indictment and prohibiting the government from making any reference to such matters at trial." *Id.* ¶¶ 5–6.

Awadallah's final motion is for "[a]n order granting evidentiary hearings on the above motions" where applicable. *Id.* ¶ 9. For the reasons discussed below, these motions are denied in part and granted in part. An evidentiary hearing is scheduled for February 15, 2002.

## II. SUMMARY

These motions collectively raise the question of whether the evidence against Awadallah should be suppressed and the Indictment dismissed. There are essentially three grounds offered in support of this result. *First*, if the government lacked probable cause to detain Awadallah,

---

1. A material witness is an individual who is not accused of committing a crime, but has testimony that is material to the investigation. *See Black's Law Dictionary* (7th ed. 1999) (defining a material witness as a person "who can testify about matters having some logical connection with the consequential facts, esp[ecially] if few others, if any, know about those matters.").

thereby unlawfully arresting him, then everything flowing from that unlawful arrest must be suppressed. *Second,* if the consent that he gave to search his home and cars as well as to speak with investigating agents was involuntary, then everything flowing from that consent must be suppressed. *Third,* if the government's conduct from the inception of the investigation through its presentation before the Grand Jury violated Awadallah's rights under the Constitution and the material witness statute, then all of the evidence must be suppressed, which would effectively result in the dismissal of the Indictment. For these reasons, an evidentiary hearing must be held.

## III. LEGAL STANDARD

The Federal Rules of Criminal Procedure "requir[e] the judge to receive evidence on any issue of fact necessary to the decision on a ... motion to suppress." Charles A. Wright et al., 3 *Federal Practice & Procedure* § 675 (2d ed. Supp. 2001). Although suppression hearings are not always required, a court should hold a hearing when the motion alleges facts that, if proved, would require the suppression of evidence. *See id.*; *see also United States v. Pena,* 961 F.2d 333, 339 (2d Cir.1992) (stating that an "evidentiary hearing on a motion to suppress ordinarily is required if the moving papers are sufficiently definite, specific, detailed and nonconjectural to enable the court to conclude that [there are] contested issues of fact going to the validity of the search." (citation and quotation marks omitted)).

A court should also hold a hearing when the defendant's allegations, if proven true, would result in dismissal of the indictment. *See United States v. Toscanino,*

500 F.2d 267, 281 (2d Cir.1974) (holding that the district court was required to hold an evidentiary hearing when defendant's allegations, if proven, would result in dismissal); *United States v. Orsini,* 402 F.Supp. 1218, 1219 (E.D.N.Y.1975) (holding that an evidentiary hearing was required because allegations of due process violations, if substantiated, would require dismissal of indictment).

For the sole purpose of determining whether an evidentiary hearing is required, I will assume that Awadallah's allegations are true. These allegations are taken directly from his attorney's affirmation in support of these motions, which have been adopted by Awadallah. *See generally* 12/3/01 Affirmation of Jesse Berman, Defendant's Attorney, in Support of Motion to Dismiss ("Berman Aff."); *see also* 12/26/01 Affidavit of Osama Awadallah, attached to the 12/28/01 Reply Affirmation of Jesse Berman ("Reply Aff.") (adopting all of the statements in Berman's Moving Affirmation).

## IV. FACTUAL BACKGROUND AND ALLEGATIONS

### A. The Defendant

Awadallah is a lawful permanent resident of the United States and a citizen of Jordan. *See* November 21, 2001 Transcript of Bail Hearing ("11/21/01 Bail Tr.") at 40. In April 1999, at the age of eighteen, he entered this country with the goal of becoming a United States citizen. *See* Grand Jury Transcript 10/10/01 ("10/10/01 GJ Tr.") at 8–9. While residing in this country, Awadallah has only lived in California, where his father and three of his brothers reside.[2] *See* Bail Tr. at 15–22.

---

**2.** Awadallah's father and eldest brother are United States citizens. *See Awadallah,* 173 F.Supp.2d at 188; *cf. Kim v. Ziglar,* 276 F.3d

523, 528 (9th Cir.2002) ("About seventy percent of lawful permanent resident aliens are admitted because of family members already

Over the last two and a half years, Awadallah has been employed as a gas station attendant, flower deliverer, janitor and, most recently, licensed security guard. *See Awadallah*, 173 F.Supp.2d at 188; *see also* 10/10/01 GJ Tr. at 27–28. He has never been convicted of any crime or ever been arrested. *See Awadallah*, 173 F.Supp.2d at 188. Awadallah's main reason for moving to the United States was to attend college and work here. *See* 10/10/01 GJ Tr. at 8; *see also* 9/22/01 FBI Form 302 ("FBI 302"). In the autumn of 2001, he began his second year at Grossmont College where he mainly studied "English as a Second Language." *See* 10/10/01 GJ Tr. at 20.

### B. Events Prior to Awadallah's Grand Jury Testimony

On the afternoon of September 20, 2001, approximately twenty FBI agents surrounded Awadallah on the street outside his home in San Diego. *See* Berman Aff. ¶ 14. The FBI agents ordered Awadallah to come to their office. *See id.* None of the agents advised Awadallah of his rights under *Miranda*, his right to refuse searches of his home or cars, or his right to contact the Jordanian consulate. *See id.* When Awadallah asked to phone his brother Jamal, the agents refused him permission. *See id.* When Awadallah asked to enter his own home, the agents told him he could not go inside.[3] *See id.* Awadal-

lah also asked if he could drive in his car to the FBI office but the FBI agents insisted that he go in an agent's car. *See id.*

Although the FBI agents told Awadallah that his interview at the San Diego office would last around thirty minutes, he was questioned until midnight. *See id.* ¶¶ 14–15. At some point during the interview, the agents explained that while searching a car that belonged to Nawaf Al–Hazmi, a suspected terrorist in the September 11th attack on the Pentagon, agents had found a piece of paper with the words "Osama 589–5316." *See* 10/10/01 GJ Tr. at 76. This number matched Awadallah's home phone number when he lived in La Mesa, California, two years earlier. *See id.* at 74. The agents also told Awadallah to sign forms stating that he consented to their searches of his home and cars.[4] *See* Berman Aff. ¶ 15. Awadallah signed the forms, but he now claims that the agents did not explain their meaning and that he never understood them. *See id.* The agents never advised Awadallah of his *Miranda* rights. *See id.* ¶ 14. The agents constantly reminded Awadallah that he was not a United States citizen. *See id.* ¶ 15.

The agents returned Awadallah to his home after midnight. *See id.* Less than six hours later, at six o'clock in the morning, some of the FBI agents returned and told him he had to go back to the office to take a lie detector test.[5] *See id.* Prior to

in the United States [who] ... are either United States citizens or, less commonly, other lawful permanent resident aliens.").

3. At one point, after Awadallah asked to go to the bathroom, the agents permitted him to go back inside to use the bathroom in his home but only with the bathroom door open and three agents watching him. *See* Berman Aff. ¶ 14.

4. It is not clear when Awadallah consented to the search of his home or his cars. The

government claims that the agents began the search at approximately 2:30 p.m. *See* 1/4/02 Letter from AUSA Karl Metzner to the Court ("1/4/02 Ltr.") at 8. But defendant states that the FBI officers first approached him outside his home at approximately 3:00 p.m. *See* Berman Aff. ¶ 14. This fact dispute should be resolved at a hearing.

5. The government asserts that Awadallah's actions were voluntary, not compelled. *See* Government's Memorandum in Opposition to Defendant's Motions to Dismiss the Indict-

taking a series of three polygraph tests, the agent who administered the test covered the lens of a surveillance camera, which prevented the procedure from being filmed. *See id.* ¶ 16.

When the lie detector tests ended, the FBI agents accused Awadallah of lying although the record does not indicate any basis for this accusation. *See id.* The agents then handcuffed, fingerprinted and photographed him. *See id.* When Awadallah asked to call his brother, the FBI agents told him that he could not make any calls until he was taken to the San Diego Metropolitan Correctional Center ("San Diego MCC"). *See id.* Awadallah arrived at the San Diego MCC around 4:00 p.m. and was permitted to call his brother at approximately 6:00 p.m. *See id.*

The same day, Awadallah's family hired a lawyer, Randall Hamud, to represent Awadallah. *See id.* Hamud went to the San Diego MCC that evening but was told that Awadallah was not there. *See id.* After an hour and a half of insisting that Awadallah was being detained there, a correctional officer sent Hamud to the attorney interview room, but Awadallah was never produced. *See id.* Instead, another inmate was produced after which Hamud was instructed to leave the facility. *See id.* Hamud's first meeting with Awadallah occurred the next day. *See id.*

The government also obtained a material witness warrant for Awadallah's arrest on September 21, although it is unclear whether this occurred before or after Awadallah was incarcerated. That warrant,

issued by a judge of this Court pursuant to the material witness statute, 18 U.S.C. § 3144, was based on a sworn affidavit by an FBI agent and relied in large part on the previous day's interview of Awadallah and searches of his home and cars. The affidavit also stated that the FBI had found Awadallah's telephone number in the car belonging to Nawaf Al–Hazmi. The agent who signed the affidavit stated: "I believe, based on the facts set out above, that there is no condition or combination of conditions that would reasonably assure the appearance of the Witness. Accordingly, I respectfully submit that the Witness be detained upon being produced for presentment, to ensure that the grand jury will receive the Witness's testimony."

As a devout Muslim, Awadallah does not eat non-*halal* food (*e.g.*, swine/pork or its by-products). *See* Berman Aff. ¶ 17. For the first five days that he was detained as a material witness, the correctional facility only served him non-*halal* meals, which affected his ability to eat a sufficient amount of food. *See id.* ¶ 18. He was not given toilet paper or soap for two days and, for three to four days, he was not allowed to shower. *See id.* ¶ 17. In addition, the floor of his cell was flooded with water when a toilet backed up. *See id.;* *see also* 9/25/01 Transcript of Detention Hearing Before Magistrate Judge Ruben Brooks ("9/25/01 Det. Tr."), at 51.[6] The correctional facility did not fix the problem for at least two days. *See* Berman Aff. ¶ 17.

---

ment and to Suppress Evidence ("Gov't Mem.") at 44. It claims that the FBI "asked" Awadallah to accompany them to their field office for an interview, that he did so "of his own free will," and that, upon arriving at the field office, Awadallah was told that "he was not under arrest and was free to leave." 1/4/02 Ltr. at 7. The government also claims that Awadallah "willingly" returned to the

FBI office the next morning to continue the interview. *Id.* at 8. This fact dispute should be resolved at a hearing. *See infra* Part VI.

6. The transcript of the hearing before Magistrate Judge Brooks is sealed and remains sealed. Only those portions referred to herein are public.

On September 25, Magistrate Judge Brooks held a detention hearing for Awadallah.[7] *See* 9/25/01 Det. Tr. at 45–61, 74–88, 106–24, 130–32. At the hearing, Hamud argued, among other things, that Awadallah had never evaded process and the government had not served Awadallah with a subpoena. *See id.* at 48. Hamud offered to turn in Awadallah's passport and "work out whatever deal we need to make with the U.S. Attorney's Office to have him testify either by deposition here or testify in New York." *Id.* at 52.

After hearing the testimony of various witnesses brought on Awadallah's behalf, the Magistrate Judge noted that the material witness statute directs a court to consider the factors described in the statute pertaining to the release or detention of a defendant pending trial. The Magistrate Judge then stated that "the charges are such that it is a factor that will be treated as weighing in favor of detention." 9/25/01 Det. Tr. at 130.

Based on a consideration of the factors set forth in the statute, the Magistrate Judge rejected Hamud's offer of "an own recognizance bond or a modest bond in the amount of $1,000" and concluded "I don't feel that either of these proposals would assure his attendance at proceedings that are the subject of this hearing." 9/25/01 Det. Tr. at 132. Hamud then offered any bail "that would, in [the court's] mind, help to ensure Mr. Awadallah's appearance." *Id.* at 134. The Magistrate Judge answered:

I considered that while I was in chambers and asked myself if I put a $100,000 figure down, if I put a $200,000 figure down, would my decision be any different. And that by itself is not

enough to change the decision because bail frequently involves, at least in my mind, items more than money.... So an abstract number is—is not enough to change the balances.

*Id.* at 135. The Magistrate Judge did not, however, determine whether there were any conditions of release that would "reasonably assure the appearance" of Awadallah before the grand jury as required by 18 U.S.C. § 3142(g). *See id.* at 138–39.

"The defendant spent two more days at the San Diego MCC, then a night at a jail in San Bernardino." 1/4/02 Ltr. at 6. At the San Bernardino County jail, Awadallah was denied permission to make any phone calls. *See* Berman Aff. ¶ 18. The guards there also forced him to strip naked before a female officer. At one point, an officer twisted his arm, forced him to bow and pushed his face to the floor. *See id.* Because he was only provided one meal that contained non-*halal* meat, Awadallah only ate an apple the entire day. *See id.*

The government transferred Awadallah to a federal facility in Oklahoma City on September 28. *See* 1/4/02 Ltr. at 6. While in Oklahoma, a guard threw shoes at his head and face, cursed at him and made insulting remarks about his religion. *See* Berman Aff. ¶ 19.

On October 1, 2001, Awadallah was shackled in leg irons and flown to New York City. He arrived at approximately 9:00 p.m. *See* 1/4/02 Ltr. at 6. At the New York airport, the United States marshals threatened to get his brother and cursed "the Arabs." Berman Aff. ¶ 20. The marshals then transported him to the Metropolitan Correctional Center in New York ("New York MCC") where he was placed

---

7. "[On] Monday, September 24, the defendant was brought to the federal courthouse in San Diego for presentment. His attorney, Randall Hamud, Esq., met with him at the courthouse that day. The presentment did not go forward, however, and was rescheduled for the following day." 1/4/02 Ltr. at 6.

in a room so cold that his body turned blue. *See id.* ¶ 21. Awadallah was then taken to a doctor. After being examined, a guard caused his hand to bleed by pushing him into a door and a wall while he was handcuffed. *See id.* The same guard also kicked his leg shackles and pulled him by the hair to force him to face an American flag. *See id.* ¶ 21.

The next day, October 2, 2001, the marshals transported Awadallah to this Court. With his hands cuffed behind his back and bound to his feet, the transporting marshals pinched his upper arms so hard that they were bruised.[8] *See id.* In the elevator, the marshals made his left foot bleed by kicking it and the supervising marshal threatened to kill him. *See id.*

The New York MCC did not provide Awadallah any *halal* meals for the first fifteen to twenty-five days that he was detained. *See id.* The correctional facility also placed him in solitary confinement. *See id.* Every time Awadallah was moved off of his floor, the guards strip searched and videotaped him with a hand-held camera. *See id.* From his arrival on October 1 until the time he testified to the grand jury on October 10, the MCC did not permit any family members to visit Awadallah or allow him to telephone Berman.[9] *See id.* During this entire time, Awadallah was held only as a material witness, not as a defendant.

### C. October 10, 2001: Awadallah's Grand Jury Testimony

When the government presented Awadallah to the grand jury as a material witness on October 10, he was dressed in prison clothes and escorted into the room by FBI agents. *See id.* ¶ 23. The agents kept him handcuffed to the witness chair throughout his testimony.[10] *See id.* He was questioned by two prosecutors rather than one. *See id.* ¶ 24. During his testimony, one of the prosecutors interrupted him, spoke in a very loud voice, argued with him and made inappropriate judgmental remarks before the grand jurors.[11] *See id.* ¶¶ 24–26.

After a colloquy, Awadallah entered the grand jury room at 10:57 a.m. and began his testimony. Because his English skills are limited, an Arabic translator was available in case he needed help. AUSA Baker introduced herself and the other prosecutor, George Toscas. Baker then stated to Awadallah: "I want you to understand that if you knowingly and intentionally provide information that is false or misleading, you could be charged with ... perjury, false statements before the Grand Jury, and obstruction of justice, all of which are felonies under federal law." 10/10/01 GJ Tr. at 5. Awadallah responded that he understood. *See id.*

AUSA Baker began by asking Awadallah to describe where he had worked since he had entered the United States, what he

---

**8.** The Government is investigating these charges and concedes that a doctor confirmed the presence of the bruises. *See* 1/4/02 Ltr. at 5.

**9.** It is unclear whether Awadallah was allowed to call his other attorney, Hamud. This should be resolved at a hearing.

**10.** The Government has written that *"defendants* are often secured while in the courtroom. Grand Jury testimony by *inmates* presents even more difficult security concerns

[because Marshals are not permitted inside the room]." 1/4/02 Ltr. at 5 (emphasis added). It is unclear, however, whether the government usually treats material witnesses in the same manner as defendants and inmates.

**11.** For example, one prosecutor stated that "defendant's testimony 'seems odd to people listening to that' and ... it 'seems suspicious'." Berman Aff. ¶ 24 (citing 10/15/01 GJ Tr. at 63).

had studied, where he had lived, and the approximate time periods for each. *See id.* at 6–13. Awadallah was also asked to name those people who lived with him. *See id.* at 14–17, 23–27. Over the course of several dozen questions, Awadallah named at least seventeen individuals with whom he had lived.[12] *See id.* He could only remember the full first and last names of five but, on some of the occasions when he forgot an individual's name, he attempted to remember their nationality. *See id.* at 17, 25.

When Awadallah forgot a name that he had mentioned in his previous interviews with the FBI or other government officials, the prosecutors attempted to refresh his memory. For example, at one point, the following exchange took place:

Q: Let's start with the people who lived with you. You mentioned Yazid. What's Yazid's last name?

A: Yazid Al–Salmi.

Q: And then you mentioned two people both Samir. What are their last names?

A: One is Samir Kawaraia. I don't know the other one.

Q: Do you remember telling us the other day that the other Samir's last name was Abdoun?

A: Yes, maybe, Samir Abdoun. That is true.

\* \* \* \* \* \*

Q: Did someone named Tilal also stay in the apartment?

A: Yes, that is true. He stayed one month. Not a long time. That is why I didn't remember.

*Id.* at 25–26.

After Awadallah answered questions about his time in the United States, the government handed him twenty pictures and asked him to state whether he recognized the person in each photograph. *See id.* at 30. The first picture that Awadallah recognized was the fourteenth shown to him, a picture of Nawaf Al–Hazmi. *See id.* at 31. At this point, the government began to ask Awadallah about when he first meet Al–Hazmi and Awadallah stopped looking at the pictures. *See id.*

According to the testimony, Awadallah explained that he first met Al–Hazmi in the spring of 2000, a year and a half earlier, while Awadallah was working at a gas station. *See id.* After Awadallah named everyone he could remember working at the gas station,[13] the following exchange (which relates to the first charge of perjury) took place:

Q: So let's go back to when you first met Nawaf Al–Hazmi. You said you were at the Texaco. Do you remember who else was there that day?

A: As far as I know, until now, Mohdar, and he was with another one.

---

12. The number of people who lived with Awadallah was perhaps larger than usual because he always shared his apartment with others due, in part, to financial reasons. In fact, at one point Awadallah lived in a shelter. *See id.* at 23; *see also* 9/22/01 FBI 302 at 2.

13. When Awadallah was first asked this question, he immediately gave the first names of eight people who worked at the gas station. Of these eight people, he remembered the full names of three and he could not recall the last names of the other five. *See* 10/10/01 GJ. Tr. at 33–34. As the questioning about whom he worked with progressed, Awadallah remembered the full name of one individual and the first name of another person. *See id.* at 34. The government also refreshed Awadallah's memory about two other people whom Awadallah did not name. When the government reminded him about these names, he confirmed that he had worked with them at the gas station. *See id.* at 35.

Q: You are saying that Nawaf was with someone else?

A: Yes.

Q: Were you there first when Nawaf and the other person arrived or were they there when you arrived?

A: I think I was there when they arrived.

Q: And did someone introduce you to Nawaf?

A: I don't think so. Because we are Arab, we introduced ourselves to each other. We don't need somebody to introduce. We just see somebody, "Oh, hi, how are you doing?" And we speak to each other.

Q: Who was the other person who was with Nawaf [Al–Hazmi] that day?

A: I don't know.

Q: Had you ever seen that person before?

A: No.

Q: I take it that it was a man?

A: Yes.

Q: Do you know what country he was from?

A: No. Nawaf or the other guy?

Q: The other man who was with Nawaf.

A: No.

Q: Did you ever learn any part of that man's name?

A: No.

*Id.* at 35–36; *see also* Indictment ¶¶ 11 and 11(a)-(e) (quoting the Grand Jury testimony). A few moments later, Awadallah testified:

Q: So you saw Mohdar and Nawaf speak with each other that day?

A: Yes.

Q: Did Mohdar speak with the other person who was with Nawaf?

A: I'm not sure. I can't remember.

Q: When you and Nawaf were talking to each other, where was the other man who had been with Nawaf?

A: I didn't pay attention.

Q: Was he standing right near you when you were talking to Nawaf?

A: He was standing near to Nawaf.

Q: And you and Nawaf spoke to each other but this other man didn't say anything?

A: No, I said like "Hello. How are you doing?" That is it.

Q: Did he say what his name was?

A: Maybe he said, but I can't remember. I'm not sure.

Q: Before this day at the gas station, had you ever seen this other man before?

A: No.

Q: Before this day at the gas station, had you ever seen Nawaf before?

A: No.

Q: After this day at the gas station, did you ever see the other man again?

A: I saw him with him, with Nawaf. They usually were together.

Q: Were you ever on any later occasion introduced to this other man by name?

A: No.

Q: So as you sit here today, you don't know if you ever knew his name?

A: Maybe he mentioned his name and I didn't catch it or something. Something like that. But after that I didn't take his name or catch his name again.

*Id.* at 39–40.

The government then moved on and began to ask Awadallah about the first conversation he had with Nawaf that lasted

about five to ten minutes. *See id.* at 41–42. Awadallah also testified that the last time he saw Nawaf Al–Hazmi was ten months earlier, in December 2000, at a mosque during Ramadan. *See id.* at 42. The government asked "What did you and he talk about [the last time]?" and Awadallah responded:

A: Like, "Hi, how are you doing?" Then he told me "I'm leaving to LA." I told him, "What are you going to do there?" He said "I'm going to flying school."

Q: Did you and he say anything else this day?

A: No. I'm not sure, I think we were eating, breaking our fast that day or something, and there is a lot of people.

*Id.* at 43.

Awadallah testified that, over the six to seven months that Awadallah knew Nawaf Al–Hazmi, they saw each other about thirty-five to forty times—mostly at the mosque (about twenty times) or gas station (about fifteen to twenty times). *See id.* at 46–47, 51. The government then asked:

Q: Do you remember whether he ever had anyone with him at the gas station besides the other people who worked there?

A: The one I mentioned.

Q: On the first day that you met him, you are talking about the other man who was with him that day?

A: Yes.

Q: Were there other days when that same man was with him at the gas station?

A: Yes.

Q: About how many times?

A: Five to ten times?

Q: Did you come to have any understanding of what the connection was between Nawaf and this other man?

A: No.

Q: Do you know, for example, whether they were good friends?

A: Well, it seems to me they are good friends. When they are always together, that means they are good friends.

*Id.* at 48–49.

Beside seeing Al–Hazmi at the mosque or gas station, Awadallah also testified that he saw him on two other occasions. *First,* they went with some other individuals to a restaurant for dinner once after attending mosque. *See id.* at 46, 62. *Second,* on one occasion Awadallah went to Al–Hazmi's house after Al–Hazmi asked him how to change the text on his computer from English to Arabic and also how to listen to music on the web. *See id.* at 43, 53–54. Awadallah had previously explained how to do these things, but when Al–Hazmi was unable to make it work, Awadallah offered to help him. *See id.* at 54. Awadallah testified:

Q: What did you and Nawaf do there at his house that day?

A: He make tea for us and I tried to do the computer. I stayed around 15 minutes trying to do the computer, change it, but it doesn't work. Then we left.

Q: When you say trying to change it, what were you trying to change?

A: The language, from English to Arabic.

Q: And you were not successful?

A: No.

Q: Did you do anything else with the computer while you were there that day?

A: We tried to go on to the Internet, but the Internet was very bad. He didn't have a good Internet. So one time it fail, one time it doesn't work. So we left it. I mean, the computer were very slow and very old.

Q: What were you trying to do on the Internet?

A: Go inside and look at web pages.

Q: What kind of web pages?

A: There is no specific web pages. What I know, like Ayna.

Q: Is that an Arabic web site?

A: Yes.

Q: With what kind of material on it?

A: Everything.

Q: Like what?

A: Everything.

Q: Can you describe some of the things that are on it?

A: Business, sports, religion, video games, whatever you want.

Q: What else? Did you try any other web site?

A: Yes, MSN. But that doesn't work. Something like that. Arabia.

Q: Any others?

A: No. Maybe, but until now I remember this.

*Id.* at 56–58. Awadallah then gave testimony about the time that he went to dinner with Al–Hazmi.[14] *See id.* at 62–64.

After the prosecutors clarified that Awadallah had mentioned every time he had seen Al–Hazmi,[15] they returned to questioning Awadallah about the man who he saw with Al–Hazmi:

Q: Besides all the times that you have told us about now, can you think of any other time that you saw Nawaf?

A: No.

Q: The other man who you mentioned who was with Nawaf sometimes at the gas station and sometimes at the mosque, did you ever see the other man anywhere else?

A: No.

Q: Did you ever see that other man alone, not with Nawaf?

A: No. I didn't pay attention to his picture very much. That is why I didn't make a communication with him.

Q: (Mr. Toscas) Excuse me, you didn't pay attention to what?

A: I didn't pay attention so much to his face or his appearance, so I didn't recognize him so much.

*Id.* at 64.

After asking a few more questions, AUSA Baker suggested taking a ten-minute recess. *See id.* at 66. When the grand jury reconvened, AUSA Baker began by stating:

Q: Before we continue with the photographs, the other man who you saw with Nawaf sometimes at the mosque and sometimes at the gas station, did you ever speak with him yourself?

A: No.

Q: Not even to exchange greetings?

A: No. I mean, the first time, yes.

Q: Did you ever overhear him speaking with someone else?

---

**14.** For example, Awadallah testified that it was a "Mexican restaurant. It is like an open restaurant, you pay $5 and you choose whatever you want. The food is in front of you and you fill." 10/10/01 GJ Tr. at 63.

**15.** Later in the testimony, Awadallah again testified that he had mentioned every time that he had seen Al–Hazmi in response to the government's questions. *See id.* at 83–84.

A: No.

Q: What I'm trying to figure out is—I assume you heard him speaking in Arabic, or when you spoke to him you spoke to him in Arabic?

A: Yes.

Q: Could you tell by the way he spoke Arabic which country he was from?

A: I don't know. Because Arabic sometimes doesn't have an accent, even if there is a different country. Sometimes it doesn't have an accent. It was the same of my language, the same thing, the same of my accent.

Q: Was there anything about his appearance that would allow you to give us an opinion of where he may have been from?

A: Maybe he is from Saudi Arabia, maybe. I have no idea.

Q: Can you describe him for us, his appearance?

A: He is taller than Nawaf and skinny. But his face, I'm not sure. He has a little beard. That is the appearance of him, taller and skinny and a little beard.

Q: Did he have black hair?

A: I think so.

Q: What color eyes?

A: I don't know.

Q: What was his skin color like?

A: Brown.

Q: More brown than yourself, for example?

A: Yes.

Q: Was he darker or lighter than Nawaf?

A: The same.

Q: Can you estimate how old he was?

A: 23 maybe, 24, around this time, 25 maybe. Because the age sometimes doesn't exist with appearance.

Q: Did you ever see him talking with anyone beside Nawaf?

A: Maybe the first time at the gas station, maybe he talked to Mohdar, I'm not sure. But he was standing besides Nawaf. But other ones, no.

Q: You never saw him talk to anyone at the mosque?

A: No. Because, I mean, I didn't pay attention to him.

Q: Well, if we wanted to try to figure out who he was, do you have any suggestion on who we would ask to get more information?

A: Mohdar maybe, if you ask him.

*Id.* at 66–69.

The government resumed asking Awadallah about whether he recognized anyone else in the pictures, *see id.* at 69–73, and whether the phone number that the agents found in Nawaf Al-Hazmi's car belonged to him, *see id.* at 74–75. Awadallah agreed that the phone number must belong to him, although he could not remember giving it to Al-Hazmi. *See id.* at 76–77. When asked, "For what reason did you give your telephone number to Nawaf?," Awadallah explained:

A: There is not specific reason. Just when we see each other, not just Nawaf, or other brothers, "Okay, this is my phone number, take it if you need something, just call me." Something like that.

Q: Do you remember when you gave your telephone number to Nawaf?

A: No. But if it is the same phone number, it must be at the time I used to live on Parkway Drive, if this is the Parkway Drive phone

number. So it must be at that period.

Q: Remind us again about when was that, from what month to what month?

A: On Parkway Drive?

Q: Yes.

A: From the end of March, I would say, April, May, June, July.

*Id.* at 76–77.

The government then asked Awadallah several dozen questions about Al–Hazmi. *See id.* at 78–84. When asked whether he had ever helped Al–Hazmi in any way other than with his computer, Awadallah answered no. *See id.* Awadallah was also asked about a picture of Osama bin Laden that Awadallah had printed from the FBI's ten most-wanted list on the Internet, *see id.* at 86–88, and some videos that the government had seized when conducting its search of his cars, *see id.* at 89–95.

AUSA Baker then asked for a moment to confer privately with the other prosecutor, *see id.* at 95, and upon returning asked that the witness be excused, *see id.* at 96. After a three-minute colloquy, the grand jury's foreperson reminded Awadallah that he was "still under oath," *id.* at 97, and AUSA Baker stated: "Actually, I apologize to the members of the Grand Jury and to the witness. On turning my pages I just realized that I have an additional line of questions that I should put to the witness." *Id.* The Grand Jury adjourned at 1:26 p.m. and reconvened at 2:55 p.m. *See id.* at 97–98.

After lunch, AUSA Baker began by asking Awadallah whether he was required to keep a journal for any classes at Grossmont College. *See id.* at 98. When asked for clarification, she explained: "There was a document that belonged to you that I haven't seen that was described to me as a journal. I would understand that word

to mean where basically you would keep descriptive entries of things that you had done on particular days...." *Id.* Awadallah responded: "No, but maybe we have an essay. I don't know what you are talking about, but that is what comes to mind." *Id.* AUSA Baker asked a few more questions about whether he kept a journal for school and then stated:

Q: It has been reported to me that in some book or notebook, some document created by you in connection with your schooling at Grossmont that you wrote something in which you said that you knew Nawaf Al–Hazmi and Khalid Al–Mihdar.

A: No.

Q: You are saying that you did not write anything like that?

A: Yes.

Q: You have obviously told us that you did know Nawaf Al–Hazmi?

A: Yes.

Q: Do you deny knowing Khalid Al–Mihdar?

A: Yes.

Q: So, in other words, you are saying you did not know anyone named Khalid Al–Mihdar?

A: No.

*Id.* at 99–100. AUSA Baker proceeded to ask over sixty questions about various subjects (*e.g.*, who Awadallah had emailed the week before he was arrested), *see id.* at 100–11, before stating:

Q: Going back to what I was asking you before about whether you were keeping a journal, if it refreshes your recollection or helps you to know what I'm asking about, apparently the book or the portfolio, whatever it is, was blue in color.

A: Yes, but I have to see it to know what is inside this book to say yes

or no. Because I have a grammar book that is blue color.

Q: Do you recall writing at any time in any book that you owned or had in your possession the names of Nawaf Al–Hazmi and Khalid Al–Mihdar?

A: No.

*Id.* at 111–12. AUSA Baker switched subjects and asked a dozen questions about a class Awadallah took at Grossmont before she asked the witness to be excused at 3:18 p.m. *See id.* at 112–14. A three-minute colloquy then took place. *See id.* at 115.

When Awadallah returned to the Grand Jury, AUSA Baker asked approximately fifty questions about how Awadallah supported himself when he first came to the United States, why he changed jobs, his understanding of "fatwa," whether he had ever seen a picture of Osama bin Laden before looking at the FBI's website, the demographics of Grossmont College, and the types of discussion that he had with Al–Hazmi. *See id.* at 115–123. AUSA Baker asked for the witness to be excused at 3:34 p.m. *See id.* at 123–24.

Fifty minutes later, at 4:25 p.m., Awadallah was recalled to the grand jury. *See id.* at 125. The foreperson reminded Awadallah that he was still under oath. *See id.* The court reporter presented Awadallah with a photocopy of an exam booklet (commonly referred to as a "blue book").[16] *See id.* The following questions and answers followed:

Q: Mr. Awadallah, the court reporter has handed you a document marked as Grand Jury Exhibit 41. Do you recognize that document?

A: Yes.

Q: Is that an exam booklet that you prepared?

A: Yes, that is for my teacher right now.

Q: You filled in all the writing in that booklet, it is yours?

A: Yes.

Q: Why don't you just flip through it and see if that is all your writing.

(Witness perusing document.)

A: Yes.

Q: When did you prepare this examination booklet?

A: Very soon. It is not so far. Like a month ago. Not a month, no, I have 20 days here already. I would say during the month before the 21st of September.

Q: It says on the front, "Name—Osama Awadallah." Underneath that it says "Subject—ESL 103." Is that the name of the class for which you prepared this?

A: Yes.

Q: And was your instructor for that class Mimi Pollack?

A: Yes.

Q: You testified earlier that you did know someone named Nawaf Al–Hazmi, correct?

A: Yes.

Q: And you testified earlier that you did not know anyone named Khalid, correct?

A: Yes.

Q: I'm looking at the next-to-last page of the document. I'm going to show it to you in a minute but I want to read it out loud because the grand jurors won't be able to see when you are looking at it.

16. The government does not appear to have found the booklet from its searches of Awadallah's cars and home, but rather received it from Grossmont College during its investigation.

At the top of the page, it says "Exercise 9." Then it has the number 4. "I have been in SD since 1998. I have always wanted to meet as much people as I can. I have met many people from many countries. One of the"—and I think it is supposed to be 'quietest,' although it is not spelled quite right—"One of the quietest people I have met is Nawaf. Another one, his name Khalid. They have stayed in San Diego for 6 months." Then it continues after that.

Did I read it correctly?

A: This handwriting is not my handwriting. All of them is my handwriting except "his name Khalid." I wouldn't write Khalid like that.

Q: If you excuse me, I'm going to come and stand next to you. I don't want to lean over you, but the only way we can see it at the same time is if I stand here.

A: Okay. Looking at the color here, it is darker more than the other. See, all the paper have the same color except here, it is like this, slanted, and the color here is more darker. Do you see that?

Q: I want you to be very specific because I want your testimony to be clear. Let's start at the top of the page. It says "Exercise 9." Did you write that?

A: Yes.

Q: And then it has the number 4. Did you write that?

A: Yes.

Q: Then the next sentence is "I have been in SD since 1998." Did you write that?

A: Yes.

Q: The next sentence is "I have always wanted to meet as much people as much as I can." Did you write that?

A: I think so, yes.

Q: Then the next sentence is "I have met many people from many countries." Did you write that?

A: Yes.

Q: Then the next sentence is "One of the quietest people I have met is Nawaf." Did you write that?

A: Yes.

Q: Then the next sentence on the line—

A: Hold on. Wait a minute. No, "Nawaf," no, it is not my handwriting.

Q: Did you write the rest of that sentence up to the word "is"?

A: "One of the quietest people I have met," right, but the name is not my handwriting.

Q: So you are saying that you wrote all the rest of that sentence but not the name "Nawaf"?

A: Yes.

Q: And the next sentence says, on the actual line that is drawn on the page, it says "Another one, his Khalid." Then in between "his" and "Khalid" someone drew a little arrow and above that is the word "name."

Did you write "another one"?

A: "Another one," yes, it is my handwriting.

Q: How about "his"?

A: No.

Q: How about "name"?

A: No.

Q: And "Khalid"?

A: No.

Q: So you are saying you wrote "another one," but not the other three words of that sentence?

A: Yes.

Q: After that, it continues "They have stayed in SD for 6 months."

A: "They have stayed," this is my handwriting. "SD" is not my handwriting.

Q: After that, it continues—

*Id.* at 126–29; *see also* Indictment ¶¶ 12, 12(b)-(m). The prosecutor continued the line of questioning and eventually stated:

Q: What I would like to do is hand you a highlighter and I'm going to give you back the document, and for anything on this page that you say is not your writing I would like you to mark it. For the things that you can't tell, wait a minute, and I will have you mark those a different way.

A: Okay.

Q: So if you would, with the yellow highlighter, please mark the things that you say you can see them on the page and they are not your handwriting.

(The witness complies.)

Q: I'm going to ask you to do one last thing and then I think we are going to take a break. I'm going to hand you now a blue pen and what I would like you to do is on the same page under-line anything where you can't tell whether it is your writing or not.

(The witness complies.)

Ms. Baker: I would note for the record that it is 4:59 according to the clock in the room. We appreciate the Grand Jury's patience in staying late. We are not going to conclude the questioning of the witness at this minute or in the next few minutes. It seems that some of you do need to leave now that you have stayed an hour over. In that case, I would ask that the witness be excused at this time and we will continue with his testimony at another time.

10/10/01 GJ Tr. at 142–43.[17]

## D. Events Subsequent to Awadallah's October 10 Grand Jury Testimony

After his testimony, Awadallah met with his attorneys, Berman and Hamud. During the conference, Berman came out of the room and conferred with the AUSA Baker. Baker advised Berman that Awadallah would have to return to the grand jury on October 15. She also told Berman that Awadallah would be shown the original examination booklet.[18] Counsel asked

---

17. Awadallah was not shown the original booklet on October 10, 2001.

18. There is some dispute over who first raised the question of reviewing the original examination booklet. Defense counsel contends that he asked the government on October 10, following the grand jury session for that day, to produce the original booklet so that his client would be able "to testify correctly" after reviewing the original. Reply Aff. ¶ 6; *see also* Berman Aff. ¶ 7 ("I asked AUSA Baker if she could obtain the original booklet in time for October 15....."). The government contends that it had already decided to show Awadallah the original booklet before the end of the grand jury session on October 10, although it "did not disclose that plan to Awadallah before he left the grand jury room." Affirmation of Robin L. Baker, dated December 21, 2001 ("Baker Aff.") ¶ 3. Baker goes on to assert that, during her conversation with defense counsel following the October 10 testimony, they "discussed the fact that Awadallah would be shown his original exam booklet...." *Id.* ¶ 5.

Defense counsel argues that this factual dispute must be resolved. *See* Reply Aff. ¶ 6. Counsel's theory is that, if he asked for the production of the original booklet, this request proves that his client was confused by the copy and that he was seeking to correct any erroneous testimony. The government contends that an evidentiary hearing is unnecessary because, even if defense counsel did request the exam booklet, counsel has not contested the fact that, after conferring with Awadallah at the end of the October 10 grand jury session, he "told AUSA Baker, in substance, that Awadallah was still denying that he had written certain of the words in the

that the government consent to Awadallah's release on bail. AUSA Baker called Hamud on the evening of October 10 and informed him that the government would not consent because it believed that Awadallah had lied to the grand jury. *See* Baker Aff. ¶ 6.

Prior to his second appearance, Awadallah reviewed the original examination booklet, spoke with his friend and co-prisoner Mohdar, and consulted with his attorneys. *See* Berman Aff. ¶ 9.

### E. Awadallah's Second Grand Jury Testimony

On October 15, Awadallah again testified before the Grand Jury. At that time, he testified that the man who was sometimes with Nawaf had told Awadallah his name the first time they met. *See* 10/15/01 GJ Tr. at 5. The prosecutor asked, "As you sit here today, do you remember any part of that other man's name?," to which Awadallah replied "No." *Id.* at 6. The prosecutor then handed Awadallah some photographs and asked whether he recognized any of the people in the pictures. *See id.* Awadallah stated that he recognized one and that the person in the photograph looked like the person who he had met with Al-Hazmi. *See id.* at 7. When asked if he "recalled any part of this man's name," Awadallah testified that "he thought that man's name was Khalid." *Id.* at 8; *see also id.* at 13–15, 27–28.

exam booklet, and that Awadallah was 'confus[ed]' ". *See* 1/4/02 Ltr. at 4 (quoting Baker Aff. ¶ 5).

As suggested by the government, defense counsel's statements indicate that, at least at that time, Awadallah was not admitting that his allegedly perjurious testimony was false. Thus, these statements preclude a finding that the conversation between defense counsel and AUSA Baker after the grand jury session on October 10 constituted a valid recantation or an offer to recant. *See United States v. D'Auria,* 672 F.2d 1085, 1091–92 (2d Cir.1982)

Awadallah never admitted that he testified falsely on October 10 with respect to his knowledge of the name of Nawaf's companion. Awadallah repeatedly testified that it was not until after his grand jury testimony had concluded on October 10, and his recollection was refreshed, that he realized that he did know that the man's name was Khalid. He repeatedly testified that he had been "confused" during his first grand jury appearance, not that he had lied. Explaining his confusion, he stated:

> "Because the printing here [in the copy] is not the same as the original. I can't see exactly my handwriting and I was confused at that time."

> \* \* \* \* \* \*

> "I can't tell if this [the copy] is my handwriting or not. And at that time I was really confused if it was really my handwriting."

> \* \* \* \* \* \*

> "[W]hen you asked me [on October 10], I wasn't sure; so I didn't say that I know his name.... But when I go back and I refresh my mind, I am trying really to remember what exactly the person who is that person was named Khalid."

> \* \* \* \* \* \*

(denying defendant's recantation defense where defense counsel's representations to AUSA did not indicate that defendant would admit that his perjurious testimony had been false, but only that defendant wanted an opportunity to add to or clarify his grand jury testimony). Although there is no need for a hearing at this time on the issue of whether defense counsel requested the original exam booklet, such testimony may be relevant at trial on the issue of whether Awadallah "knowingly" gave false testimony. 18 U.S.C. § 1623(a).

"[D]uring the period of time that I forgot and said I did not know him, I had some kind of confusion, I couldn't remember. That's why I said I don't know. But when I saw my original document here [referring to original exam booklet], I made sure and then I remembered that this was a person I knew."

*Id.* at 13, 25, 27–28, 64.

Awadallah asserts that, after reviewing the original exam booklet, he "corrected" his previous grand jury testimony by giving the following testimony. Berman Aff. ¶ 8.

Q: Do you recall any part of this man's name?

A: I think Khalid.

 * * * * * *

Q: Do you recognize Grand Jury Exhibit 59 as being your original exam booklet?

A: Yes.

Q: All right. It's open now to the page which shows Exercise 9 that we were just discussing.

A: Yes.

Q: I would like you to take a minute and look it over. And my question for you is going to be whether all of the writing that appears on that page is your handwriting?

A: Yes.

Q: Are you saying that all of the writing on that page is your handwriting?

A: Yes.... Because the printing here [the copy was marked as grand jury exhibit 41] is not the same as the original. I can't see exactly my handwriting and I was confused at that time. I was a little nervous and so I said some of it is not my

handwriting, but these, all of it is in my handwriting.

10/15/01 GJ Tr. at 8, 12–13.

Awadallah is now charged with making a false declaration to the grand jury when he testified on October 10 that he did not know Khalid Al–Mihdhar's name. *See Awadallah,* 173 F.Supp.2d at 187–88. Awadallah is also charged with lying to the grand jury when he denied that he wrote the name "Khalid" and certain other words in the exam booklet. *See id.* at 188.

## V. THE MOTIONS TO DISMISS THE INDICTMENT

Awadallah argues that the indictment for perjury must be dismissed for four reasons: (1) he recanted his false testimony; (2) the government violated the Vienna Convention on Consular Relations by not informing him of his rights as a foreign national; (3) the government interfered with his right to counsel; and (4) the government denied him due process while holding him in custody both prior to his grand jury appearance and during his appearance. *See* Notice of Motion ¶¶ 1–4.

### A. The Recantation Defense: 18 U.S.C. § 1623(d)

██ Pursuant to 18 U.S.C. § 1623(d), recantation is a complete defense to a charge of perjury before a grand jury. Specifically section 1623(d) states:

> Where, in the same continuous court or grand jury proceeding in which a declaration is made, the person making the declaration *admits such declaration to be false,* such admission shall bar prosecution under this section if, at the time the admission is made, the declaration has not substantially affected the proceeding, or it has not become manifest that such falsity has been or will be exposed.

18 U.S.C. § 1623(d) (emphasis added). As the plain language of the statute shows, a recantation will only bar prosecution for perjury if the defendant admits that his allegedly perjurious statement is "false".[19]

██ Every Circuit Court that has addressed this issue, including this Circuit, has held that the recantation defense is an issue of law to be decided by the court. These courts have also agreed that the defense can only be invoked if the defendant unequivocally admits that his allegedly perjurious statements were false. *See United States v. Kahn,* 472 F.2d 272, 283 n.9 (2d Cir.1973); *see also Tobias,* 863 F.2d at 689 ("[A] defendant must unequivocally repudiate his prior testimony to satisfy § 1623(d)."); *United States v. Scivola,* 766 F.2d 37, 45 (1st Cir.1985) ("[A] mere implicit admission of rendering false testimony does not satisfy the requirement of an effective recantation under section 1623(d). A witness must make an outright retraction and repudiation of prior false testimony."); *United States v. Goguen,* 723 F.2d 1012, 1018 (1st Cir.1983) ("[F]or an effective recantation, the accused must come forward and explain unambiguously and specifically which of his answers in prior testimony were false and in what respects they were false."); *D'Auria,* 672 F.2d at 1091–92 ("[I]n order to recant the witness must, as a condition precedent to giving truthful testimony, admit that his perjurious testimony was false. An outright retraction and repudiation of his false

testimony is essential to a 'recantation' within the meaning of the statute.").

Awadallah contends that he was "confused" or he "forgot," or that the photocopy of the examination booklet was not clear, but has not admitted that his testimony was "false". While the questions of whether he was "confused" or "forgot" may be relevant to the issue of whether he knowingly lied to the grand jury, that is a question of fact for the jury to decide. The only question that this Court must decide, as a matter of law, is whether he made a timely recantation by "admit[ting] [that his] declaration [was] false." 18 U.S.C. § 1623(d). Awadallah made no such admission.

Even if Awadallah's October 15 testimony were read as a retraction and repudiation of his allegedly false testimony, his recantation defense would fail because he does not meet the "manifestation" requirement of the section 1623(d). Pursuant to section 1623(d), recantation is only a defense if, at the time the defendant admits the falsity of his statement, "it has not become manifest that such falsity has been or will be exposed." *Id.* This element is a necessary pre-condition to asserting the recantation defense. *See United States v. Fornaro,* 894 F.2d 508, 511 (2d Cir.1990) ("We therefore hold that recantation is an effective bar to prosecution only if the false statement has not substantially affected the proceeding *and* if it has not become manifest that the falsity has been or will be exposed." (emphasis in original)).

---

**19.** The Second Circuit has not yet addressed whether the prosecution or the defense bears the burden of proof of establishing the recantation defense and other circuits have split. The Fifth and D.C. Circuits hold that "the defendant must show that he is within an exception." *United States v. Scrimgeour,* 636 F.2d 1019, 1024 (5th Cir.1981). *See also United States v. Moore,* 613 F.2d 1029, 1044–45 (D.C.Cir.1979) (same). The Ninth Circuit has held that "the prosecution must prove the

inapplicability of this [recantation] defense beyond a reasonable doubt." *United States v. Guess,* 629 F.2d 573, 577 n. 4 (9th Cir.1980). *See also United States v. Tobias,* 863 F.2d 685, 688 (9th Cir.1988) (same). It is unnecessary to decide the issue here. Even assuming the government has the burden of proving, by a fair preponderance of the evidence, that the recantation defense has not been met, the government has satisfied the burden in this case.

"The proper test to apply ... when determining whether recantation occurred before imminent exposure was manifest, is whether the fact that the statements have been or will be exposed as false is objectively manifest to the declarant." *United States v. Smith*, 35 F.3d 344, 347 (8th Cir.1994).[20]

Awadallah had various reasons to know, prior to his October 15 testimony, that his allegedly false testimony would be exposed. *First*, Awadallah's counsel had been informed that the government believed he lied on October 10.[21] *See* Baker Aff. ¶ 6. *Second*, with respect to the charge in Count One—that Awadallah lied when he stated that he did not know the name of the man who was with Nawaf—the examination booklet itself made manifest that he had known the name, at least at the time he wrote the booklet. *Third*, with respect to the allegation in Count Two—that Awadallah lied when he said he had not written Nawaf's and Khalid's names in his exam booklet—Awadallah's own testimony that he had written everything in the exam booklet made it manifest, at least to an objective declarant, that the falsity of one statement or the other would be exposed. Accordingly, the recantation defense fails as a matter of law.[22]

It is worth mentioning that Awadallah is not alone in his failure. The recantation defense appears to be an illusion—often asserted but never found. The parties have brought no case to the Court's attention, nor has the Court found any case, in which a defendant has successfully asserted that, at the time of his recantation, it was not manifest that his prior false statement might be exposed.[23]

---

**20.** This test makes sense; if the test were a subjective one, a perjurer would be able to recant at any time by simply declaring that he had not realized, prior to recanting, that his perjury would be exposed, even though an objective observer would undoubtedly have reached the contrary conclusion.

**21.** In determining what has become manifest before a defendant recanted, courts have considered not only information possessed by the defendant, but also information presented to defendant's attorney. *See, e.g., United States v. Lewis*, 876 F.Supp. 308, 311 (D.Mass.1994) (denying defendant's motion to dismiss under section 1623(d) because, among other things, "the Assistant U.S. Attorney had informed his lawyer a few days earlier that the government 'had reason to doubt the truthfulness' of his testimony."); *United States v. Tucker*, 495 F.Supp. 607, 613 (E.D.N.Y.1980) (denying motion because, among other things, "the prosecutor ... told defendant's counsel immediately prior to defendant's recantation appearance that, in the Government's view, the appearance was 'too late'."); *United States v. Mazzei*, 400 F.Supp. 17, 19 (W.D.Pa.1975) (denying motion because "[f]ollowing [the defendant's] appearance before the grand jury, defendant's counsel was advised by the U.S. Attorney that he considered defendant's an-

swers to be untrue and would seek an indictment."); *Cf. D'Auria*, 672 F.2d at 1087 (noting that, between alleged false testimony and alleged recantation, AUSA informed defense counsel he believed defendant's testimony to be perjurious).

**22.** The recantation defense may not be raised at trial. *See Fornaro*, 894 F.2d at 511 ("[T]he recantation defense must be raised, if at all, prior to trial."); *United States v. Denison*, 663 F.2d 611, 615 (5th Cir.1981) ("[T]he defense of recantation must be raised before trial under Federal Rule of Criminal Procedure 12(b)(2) as a jurisdictional bar to prosecution.... Once rejected, the recantation issue may not be raised at trial and argued to the jury."). Awadallah may rely on his October 15 testimony, however, to prove that he did not act knowingly on October 10, but rather that his testimony was a result of mistake or confusion. *See* Gov't Mem. at 28 n. 7; *see also United States v. Lighte*, 782 F.2d 367, 372–73 (2d Cir.1986) (holding that for a false statement to have been made "knowingly" under section 1623, the declarant must not have made it "by mistake or inadvertence").

**23.** *See* 65 *A.L.R.* 177 § 2(a) (2000) ("Perjury defendants have been thus far unsuccessful in asserting that it was not manifest at the time

It is not difficult to understand this result given the courts' broad interpretation of the terms "admits to be false" and "manifest." Under these interpretations, a defendant must seemingly incriminate himself by admitting that he *intentionally* made a false statement (*i.e.*, committed perjury) and then pray that a court will find that the falsity of his previous statement was not already manifest. This interpretation, in effect, nullifies the statute because, to invoke the defense, a defendant must forfeit his Fifth Amendment right against compulsory self-incrimination. This, in turn, ignores the canon of statutory construction under which courts must generally interpret statutes to avoid constitutional problems. *See I.N.S. v. St. Cyr*, 533 U.S. 289, 121 S.Ct. 2271, 2279, 150 L.Ed.2d 347 (2001).

Nonetheless, this Court is bound by precedent and Awadallah's recantation defense must be rejected.

### B. Right to Counsel

■ Awadallah next argues that this Court should exercise its supervisory powers to dismiss the indictment based on the fact that the government repeatedly deprived him of his constitutional right to an attorney. *See* Berman Aff. ¶¶ 14–16, 18 and 21. According to Awadallah, he was without counsel when questioned by the FBI agents on September 20 and 21 and when he took a polygraph test on September 21. *See id.* Moreover, he was not allowed to contact his attorney when he

was at the San Bernardino jail or when he was being held at the New York MCC prior to his grand jury testimony. *See id.* ¶¶ 18, 21. On the other hand, Awadallah had the benefit of counsel at many critical times. He was represented by counsel the day before and the day of his bail hearing in San Diego, at his presentment in New York, during his proffer sessions with the government in New York, during his two grand jury appearances,[24] between his first and second grand jury appearance, and following his grand jury appearances. *See* 1/4/02 Ltr. at 6–7; *see also generally*, Berman Aff. and Reply Aff.

While Awadallah recognizes that he had some access to counsel, he argues that it was too little and too late. He claims that, because of the deprivation he experienced during the period prior to his grand jury testimony, he was ultimately "too exhausted and disoriented [to] properly avail himself of the services of his counsel." Reply Aff. ¶ 23. According to his counsel, Awadallah's debilitated condition at the grand jury hearing was evidenced by the fact that, during the entire first day of testimony, he never once requested the opportunity to speak to his counsel. *See id.*

To support his proposition that this Court may dismiss the Indictment based on the alleged deprivations, Awadallah cites *United States v. Hastings*, 461 U.S. 499, 505, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983), *McNabb v. United States*, 318 U.S. 332, 340–41, 63 S.Ct. 608, 87 L.Ed. 819 (1943) and *Toscanino, supra.* While con-

---

of the recantation that the prior falsehood had been or would be exposed."); *see also* Richard H. Underwood, "Perjury! The Charges and the Defenses," 26 *Dug. L.Rev.* 715, 747 (1998) ("[T]he courts have interpreted the 'manifestation' condition in a way that makes compliance virtually impossible ... the prosecutor will almost always be able to contend that the perjury was manifest at the time it came out of the defendant's mouth."); James

Neslund, *Perjury and False Declarations, in White Collar Crime: Business and Regulatory Offenses* 10–25 (1990) ("[T]o date no reported decision reveals a defendant who has successfully avoided a section 1623 conviction by using the recantation provision.").

**24.** Counsel are permitted to remain outside the grand jury to consult with the witness should he request the opportunity.

firming this Court's supervisory powers over the administration of justice, these cases do not support the proposition that interference with access to counsel justifies dismissing a properly returned indictment.[25] Indeed, the Supreme Court has held that there was no violation of due process where police failed to inform a suspect undergoing interrogation that his family had hired an attorney. *See Moran v. Burbine*, 475 U.S. 412, 432–34, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986).

Even if interference with a defendant's right to counsel might justify dismissal of an indictment under some circumstances, it would not be appropriate here. Awadallah had access to counsel before, during and after his grand jury testimony. While the alleged deprivations Awadallah experienced at other times are troubling, they do not, in isolation, violate due process. Accordingly, dismissal of the Indictment on this ground is not warranted.

### C. The Violation of the Vienna Convention

█ The Vienna Convention on Consular Relations is a 1963 multilateral treaty to which the United States and Jordan are parties. *See* Vienna Convention on Consular Relations and Optional Protocol on Disputes, Apr. 24, 1963, art. 36, 21 U.S.T. 77, 100–101. Among other things, the treaty provides that when a foreign national is arrested, that national may request that the arresting agency notify the national's consulate or consular official of the arrest. *See id.* art. 36(1)(b). The consular official may then visit the national, help to provide legal counsel, or arrange for a visit with the national's family. *See id.* art. 36(1)(c).

Awadallah claims that he was never advised of his right to have the Jordanian consulate notified of his arrest. *See* Berman Aff. ¶ 29. For the purposes of this motion, the government does not dispute this allegation. *See* Gov't Mem. at 55 n.12. Awadallah further claims that his purported consents to search his home and his cars were given without the advice of counsel that flowed directly from the violation of the Vienna Convention.

Like other circuits, the Second Circuit has foreclosed Awadallah's argument. In *United States v. De La Pava*, 268 F.3d 157 (2d Cir.2001), the Second Circuit held: "[The] Government's failure to comply with the consular-notification provision [of the Vienna Convention] is not grounds for dismissal of [an] indictment." *Id.* at 165. *See also United States v. Page*, 232 F.3d 536, 540 (6th Cir.2000)("[T]here is no right in a criminal prosecution to have evidence excluded or an indictment dismissed due to a violation of [the consular notification provision of the Vienna Convention]."); *United States v. Chaparro–Alcantara*, 226 F.3d 616, 618 (7th Cir.2000), *cert. denied*, 531 U.S. 1026, 121 S.Ct. 599, 148 L.Ed.2d 513 (2000)(holding that dismissal of an indictment is not an available remedy for a violation of the Vienna Convention); *United States v. Nai Fook Li*, 206 F.3d 56, 60 (1st Cir.2000) (en banc), *cert. denied*, 531 U.S. 956, 121 S.Ct. 378, 379, 148 L.Ed.2d 292 (2000)("[T]he appropriate remedies [for lack of consular notification] do not include suppression of evidence or dismissal of the indictment."). Accordingly, Awadallah's motion to dismiss the Indictment on this ground must be denied.

---

**25.** Defendant's reliance on *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), is somewhat misplaced. *Massiah* held that defendant's statement obtained in violation of his Sixth Amendment right to counsel must be suppressed. *See id.* at 207, 84 S.Ct. 1199. By analogy, defendant appears to argue that due to the violation of his Sixth Amendment right to counsel, his entire grand jury testimony should be suppressed.

## D. Due Process

■ Awadallah argues that the perjury indictment must be dismissed "because of the denial of due process by the government in its treatment of defendant, both during the twenty days he was in custody prior to his testifying in the grand jury, as well as during his grand jury appearance." Berman Aff. ¶ 13. Defendant claims:

> This mistreatment directly impacted on defendant's ability to testify calmly and effectively before the grand jury, requiring dismissal of the indictment herein. But this mistreatment was so horribly at odds with the very notion of due process that, even if the mistreatment did not directly impact on defendant's ability to testify calmly and effectively before the grand jury, the only appropriate sanction is dismissal of the indictment.

*Id.* ¶ 13. In support of this motion, the defendant cites one Second Circuit case, *United States v. Toscanino,* 500 F.2d 267 (2d Cir.1974). *See id.* ¶ 27.

The government recognizes that *Toscanino* provides "a very narrow exception under which a court may, under some circumstances, dismiss an indictment based on extreme United States Government misconduct." Gov't Mem. at 51. "Under *Toscanino,* a court must divest itself of jurisdiction over a criminal defendant where that jurisdiction was 'acquired as the result of the government's deliberate, unnecessary and unreasonable invasion of the accused's constitutional rights.'" *Id.* (quoting *Toscanino,* 500 F.2d at 275). But "[e]ven accepting the allegations in Berman's affirmation as true, the defendant has not come close to making the threshold showing required to justify even a hearing" on the motion. *Id.* at 49.

The government is partially correct: The alleged abuse is not so outrageous as to warrant a dismissal under *Toscanino* and its progeny. As I explain below, how-

ever, this does not end the inquiry into whether Awadallah's due process rights were violated.

### 1. *Toscanino*

In *Toscanino,* an Italian national, Francisco Toscanino, alleged that Brazilian officials in cooperation with United States agents kidnapped him while he was living in Uruguay. *See Toscanino,* 500 F.2d at 269. Toscanino was then brought to Brasilia, where he was incessantly and brutally tortured over seventeen days by Brazilians acting as agents of the United States government. *See id.* at 270. Moreover, according to Toscanino, a member of the Department of Justice participated in the interrogation and an Assistant U.S. Attorney was provided reports of the torture. *See id.* Toscanino was then flown to the United States where he was arrested and convicted by a jury for conspiring to import drugs into the United States. *See id.* at 269.

The question before the Second Circuit was whether the court could exercise its jurisdiction if the defendant proved that such outrageous acts had occurred. *See id.* at 271. Under the long-standing *Ker–Frisbie* doctrine, the manner in which an indicted individual comes before a court does not affect the court's jurisdiction. *See Frisbie v. Collins,* 342 U.S. 519, 72 S.Ct. 509, 96 L.Ed. 541 (1952); *Ker v. Illinois,* 119 U.S. 436, 7 S.Ct. 225, 30 L.Ed. 421 (1886). Thus, a federal court generally has jurisdiction over a foreign national whenever he has been brought before the court even if the appearance is involuntarily. *See, e.g., United States v. Alvarez–Machain,* 504 U.S. 655, 669–70, 112 S.Ct. 2188, 119 L.Ed.2d 441 (1992).

After holding that the *Ker–Frisbie* doctrine could no longer stand as an *absolute* bar to judicial inquiry into how the defen-

dant was brought before the court, the Second Circuit held:

> [W]e view due process as now requiring a court to divest itself of jurisdiction over the person of a defendant where it had been acquired as the result of the government's deliberate, unnecessary and unreasonable invasion of the accused's constitutional rights.

*Toscanino*, 500 F.2d at 275. Accordingly, the court remanded the case to the district court to determine if Toscanino's allegation could be proved. A year after *Toscanino*, the Second Circuit emphasized that it "did not intend to suggest [in *Toscanino*] that any irregularity in the circumstances of a defendant's arrival in the jurisdiction would vitiate the proceedings of the criminal court." *United States ex rel. Lujan v. Gengler*, 510 F.2d 62, 65 (2d Cir.1975).

*Toscanino's* holding is nonetheless remarkable because it requires dismissal of an indictment even when the constitutional violations have no connection to defendant's crime or to the fairness of the trial. Toscanino did not allege that the government's conduct caused him to sell drugs in the United States. Nor did he claim that the government discovered any evidence during the abduction or torture that it then used against him in its prosecution. Given that *Toscanino* requires courts to relinquish their jurisdiction over a defendant despite the fact that the government can *properly* prove that the defendant committed the crime, it is not surprising that courts have been reluctant to apply it.

In fact, "no court, including the *Toscanino* court which remanded the case for factual findings, has ever found conduct that rises to the level necessary to require the United States to divest itself of jurisdiction." *Matta–Ballesteros v. Henman*, 896 F.2d 255, 261 (7th Cir.1990).[26]

A comparison of Awadallah's allegations with those allegations rejected by other courts in this context shows his alleged abuse is not "so horribly at odds" with the notions of due process that this Court must divest itself of jurisdiction over him. Berman Aff. ¶ 13. *Compare id.* ¶¶ 13–27 *with United States v. Cordero*, 668 F.2d 32, 37 (1st Cir.1981) (Breyer, J.) (refusing to apply *Toscanino* when defendant alleged that foreign arresting authorities "insulted him, pushed him and slapped him" and while in jail defendant "was poorly fed, he had to sleep on the floor and had to 'huddle up in a corner' to avoid the splashing of urine coming from prisoners in other cells," because these conditions "are a far cry from deliberate torture" warranting dismissal); *United States v. Yunis*, 681 F.Supp. 909, 921 (D.D.C.1988), *rev'd on other grounds*, 859 F.2d 953 (D.C.Cir.1988), *aff'd*, 924 F.2d 1086 (D.C.Cir.1991) (holding that *Toscanino* exception did not apply when defendant alleged that during the arrest both of his wrists were fractured and he suffered various medical problems for which he received inadequate medical attention, and the government deliberately delayed his arrival in the United States by four days).

---

**26.** *See also United States v. Toscanino*, 398 F.Supp. 916, 917 (E.D.N.Y.1975) (denying the motion to dismiss because the defendant failed to present "any credible evidence" that showed participation by United States officials in his abduction or torture); 1 Wayne R. LaFave, *Search and Seizures* § 1.9, at 295 n.21 (3d ed.1996) (collecting cases).

Moreover, the Fifth, Seventh, Ninth and Eleventh Circuits have rejected *Toscanino* on the ground that due process violations do not require a court to divest itself of jurisdiction as long as the government's behavior has not tainted the conviction. *See United States v. Matta–Ballesteros*, 71 F.3d 754, 763 n. 3 (9th Cir.1995); *Matta–Ballesteros*, 896 F.2d at 260; *United States v. Darby*, 744 F.2d 1508, 1531 (11th Cir.1984); *United States v. Winter*, 509 F.2d 975, 987–88 nn. 35–36 (5th Cir.1975).

## 2. Did the Government Set a Perjury Trap?

█ The protection that the Due Process Clause affords defendants does not begin and end with *Toscanino*. The Second Circuit has also suggested that the setting of a "perjury trap" may constitute the type of "outrageous conduct" that would violate the Due Process Clause. *See United States v. Regan*, 103 F.3d 1072, 1079 (2d Cir.1997); *Wheel v. Robinson*, 34 F.3d 60, 67–68 (2d Cir.1994). Under the perjury trap doctrine, a perjury charge must be dismissed when a prosecutor conducts an investigation or asks particular questions of a witness "for the primary purpose of obtaining testimony from him in order to prosecute him later for perjury." *Wheel*, 34 F.3d at 67. *See also United States v. Chen*, 933 F.2d 793, 796–97 (9th Cir.1991) ("[Perjury trap] involves the government's use of its investigatory powers to secure a perjury indictment on matters which are neither material nor germane to a legitimate ongoing investigation of the grand jury. Such governmental conduct might violate a defendant's fifth amendment right to due process, or be an abuse of grand jury proceedings.") (citations omitted).[27] At the same time, grand juries and prosecutors are afforded a wide degree of latitude in their investigations. Thus, a perjury indictment may not be dismissed if there exists a "legitimate basis" for the questions that were answered falsely.[28] *Regan*, 103 F.3d at 1079.

The facts of this case raise a question about whether the government had a legitimate basis for repeatedly asking the particular questions that it now accuses Awadallah of answering falsely. The prosecutors were fully aware that Awadallah could not remember the first and last name of every person he had met in the last three years. Indeed, Awadallah even forgot the names of people that he had mentioned in the interviews with the government in the previous three weeks. When he did forget, the prosecutors reminded him of those interviews in an apparent effort to refresh his recollection. There has been no accusation that Awadallah was lying about his ability to remember *those* names during his grand jury testimony. Yet, when Awadallah did not provide the name of Khalid Al–Mihdar the prosecutors made no effort to refresh Awadallah's recollection despite the fact that they knew that there was an exami-

---

27. *See generally* Andrew Riggs Dunlap & David M. Herzog "Perjury," 38 *Am.Crim. L.Rev.* 1121, 1147 (2001) ("[W]hen a grand jury calls a defendant in order to create an opportunity for perjury and not for the purpose of assisting in an investigation, the defendant finds herself in a 'perjury trap.' "); Bennett L. Gershman, "The 'Perjury Trap,' " 129 *U. Pa. L.Rev.* 624, 645 (1981) ("If, under the guise of an otherwise legitimate investigation, a prosecutor solicits testimony with the premeditated design of indicting the witness for perjury, the grand jury is put to an unintended and inappropriate use.").

28. The Second Circuit has also held:
 [W]hether investigative conduct violates a defendant's right to due process cannot depend on the degree to which the governmental action was responsible for inducing the defendant to break the law. Rather, the existence of a due process violation must turn on whether the governmental conduct, standing alone, is so offensive that it "shocks the conscience," regardless of the extent to which it led the defendant to commit his crime.

 *United States v. Chin*, 934 F.2d 393, 398 (2d Cir.1991) (quoting *Rochin. v. California*, 342 U.S. 165, 172, 72 S.Ct. 205, 96 L.Ed. 183 (1952)). Thus, contrary to defendant's argument, the question is not whether the government's questioning *caused* Awadallah to commit perjury. Rather, the question is whether the type of questioning that the prosecutors engaged in is so offensive as to warrant dismissal because its primary purpose was illegitimate.

nation book in which Awadallah had written the word "Khalid."

Of course, the fact that the prosecutors knew about the examination booklet is not enough to show that the prosecution set a perjury trap. The prosecution is not required to disclose all (or even any) information to a grand jury witness. Nor is the government "precluded from questioning the witness about this information before a grand jury—lest the witness be 'tricked' into perjuring himself." *United States v. Bin Laden*, No. 98 Cr. 1023, 2001 WL 30061, at *8 (S.D.N.Y. Jan. 2, 2001).

In this case, however, the issue of a perjury trap is raised by examining the totality of the grand jury testimony. Throughout the first day, the prosecutors *repeatedly* focused their questions on the *name* of the person who was with Nawaf Al–Hazmi but asked few questions about his appearance or who else might know him or his name. Moreover, the prosecutors were willing to refresh Awadallah's recollection on many other questions. While Awadallah never provided the name of Nawaf's companion during his October 10 Grand Jury testimony, the record reveals that Awadallah was neither recalcitrant nor reluctant. Indeed, he appeared to be fully cooperative. He spontaneously raised the issue of the "other person" that everyone now agrees was Khalid Al–Mihdar, *see* 10/10/01 GJ Tr. at 35, and made efforts to describe him, *see id.* at 69. Awadallah also identified one person who might know his name. *See id.* Despite this, it was only at the end of the day that the prosecutors showed Awadallah a copy of the examination booklet. Whether there was any legitimate purpose for this

type of questioning or whether it was a perjury trap is an issue that must be resolved.[29]

## VI. THE MOTIONS TO SUPPRESS

Awadallah moves for an order suppressing *all* evidence that the FBI agents seized when they searched his property on September 20, 2001, on the ground that their seizure was the product of "coercions, threats and deception." Notice of Motion ¶ 7; Berman Aff. ¶¶ 38–40. This conclusion may be reached on two grounds: (1) Awadallah may have been unlawfully arrested on September 20, 2001, and (2) even if not arrested, the FBI agents may have coerced him into giving his consent to search. For the same reasons, Awadallah also seeks "[a]n order suppressing *all* statements made by the defendant to government agents between September 20, 2001, and October 3, 2001." Notice of Motion ¶ 8 (emphasis added); Berman Aff. ¶ 41. *See also Wong Sun v. United States*, 371 U.S. 471, 474, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

The government, in turn, has given three reasons for why "no hearing on these matters is necessary." Gov't Mem. at 36. *First*, "the defendant's motion is not supported by an affidavit or other evidence from the defendant or anyone else with personal knowledge of the events." *Id. Second*, Awadallah's allegations, even if proven, "do not suffice to make out a claim of factual involuntariness." *Id.* at 46. *Third*, "even accepting *arguendo* that the evidence and statements were obtained im-

---

**29.** The information necessary to resolve this issue is contained within the two days of grand jury testimony. Thus, there are few, if any, evidentiary issues that need to be resolved. The government, however, has requested an opportunity to address any issue

that has not been fully briefed that this Court may find determinative. *See* 1/3/02 Letter from AUSA Baker to the Court at 2. The issue will be resolved after the evidentiary hearing and further briefing.

properly, the exclusionary rule does not apply because the evidence was seized *before* the defendant made the statements that form the basis of the current perjury prosecution." *Id.* (emphasis added).

For the reasons that follow, the government's arguments are rejected. An evidentiary hearing will be held to determine whether Awadallah was unlawfully arrested, whether his consent was coerced, whether his statements were involuntarily given and, if so, what evidence should be suppressed.

## A. Awadallah's Affidavit

The government's argument that Awadallah failed to support his motion with an appropriate affidavit no longer has merit because, on December 26, 2001, he submitted a personal affidavit adopting all of the statements made in his counsel's affirmations.[30] Awadallah's counsel explains that he was originally unable to obtain a personal affidavit because Awadallah was kept in solitary confinement at the MCC. *See* Reply Aff. ¶ 8. When counsel was eventually permitted to visit Awadallah, he was not allowed to hand Awadallah any papers or a pen. *See id.*

I accept this explanation and now accept Awadallah's supporting affidavit as sufficient to raise a question of fact as to the voluntariness of his consent to search his home and cars and the voluntariness of his statements. *See United States v. Ahmad,* 992 F.Supp. 682, 685 (S.D.N.Y.1998) (explaining that affidavit of person with personal knowledge of the facts is required to raise a factual question as to voluntariness that could lead to suppression of evidence).

---

**30.** The government submitted its opposition papers raising the issue of the affidavit on

## B. Did the Police Unlawfully Seize Evidence and Obtain Statements?

### 1. Was Awadallah Unlawfully Arrested?

▉ Under the Fourth Amendment, there are only two grounds on which the police may arrest an individual if they do not have a warrant: (1) if the arresting officer has "reasonable ground" to believe that the individual has committed a felony, or (2) if the officer has probable cause to believe that an individual committed a misdemeanor *in the officer's presence.* *See Atwater v. City of Lago Vista,* 532 U.S. 318, 121 S.Ct. 1536, 1557, 149 L.Ed.2d 549 (2001) ("If an officer has probable cause to believe that an individual has committed even a very minor criminal offense *in his presence,* he may, without violating the Fourth Amendment, arrest the offender." (emphasis added)); *United States v. Watson,* 423 U.S. 411, 418, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976) ("The cases construing the Fourth Amendment thus reflect the ancient common-law rule that a peace officer was permitted to arrest without a warrant for a misdemeanor or felony committed in his presence as well as for a felony not committed in his presence if there was reasonable ground for making the arrest."); *Carroll v. United States,* 267 U.S. 132, 156–57, 45 S.Ct. 280, 69 L.Ed. 543 (1925) ("The usual rule is that a police officer may arrest without warrant one believed by the officer upon reasonable cause to have been guilty of a felony, and that he may only arrest without a warrant one guilty of a misdemeanor if committed in his presence....").

On September 20, 2001, when the agents first approached Awadallah, they did not have a warrant. Nor did they have any

December 21, 2001.

evidence or even reasonable suspicion that he had committed *any* crime, misdemeanor or otherwise. At most, they believed he was a material witness in their investigation. There is no authority, however, for the conclusion that having "reasonable suspicion" that a person is a material witness is sufficient to permit a warrantless arrest. The agents could certainly initiate a voluntary encounter with Awadallah, which the government claims they did. *See United States v. Tehrani*, 49 F.3d 54, 58 (2d Cir. 1995). But the FBI agents had no right to arrest Awadallah before obtaining a warrant.

The Fourth Amendment to the United States Constitution mandates: "The right of the people to be secure in their persons ... against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." *U.S. Const.* amend. IV. If the agents believed that they had sufficient evidence to arrest Awadallah prior to questioning him and searching his property, they could have sought a warrant from the court. Their failure to do so may indicate that the purpose of the confrontation with Awadallah was to obtain sufficient evidence via consent searches and interrogation in order to obtain a warrant. A key question is whether FBI agents improperly arrested Awadallah.

The Supreme Court has stated that "the crucial test is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" *Florida v. Bostick*, 501 U.S. 429, 437, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991) (quoting *Michigan v. Chesternut*, 486 U.S. 567, 569, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988)). "As long as the person to whom questions are put remains free to disregard the questions and walk away, there has been no intrusion upon that person's liberty or privacy as would under the Constitution require some particularized and objective justification." *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). Accordingly, "[a]n arrest requires *either* physical force ... or, where that is absent, *submission* to the assertion of authority." *California v. Hodari D.*, 499 U.S. 621, 626, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991) (emphasis in original). Examples of what might constitute a seizure include "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Mendenhall*, 446 U.S. at 554, 100 S.Ct. 1870.

In this case, Awadallah claims that twenty FBI agents surrounded him on the street and refused him permission to return to his own home, call his brother, or drive to the FBI office. The nature of these allegations raise a question as to whether "[a]s a practical matter, [he] was under arrest." *Florida v. Royer*, 460 U.S. 491, 503, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). A hearing is necessary to examine the totality of circumstances and determine whether and when he was arrested.

### 2. Were Awadallah's Statements to the Agents Given Involuntarily?

In determining whether a defendant's statements to the police or other government agents were involuntary, courts must look at the totality of the circumstances surrounding the interrogation. *See United States v. Ruggles*, 70 F.3d 262, 264–65 (2d Cir.1995) ("In mak-

ing this review, we considered, as we are required to do, 'the totality of all the surrounding circumstances.' " (citation omitted)). Courts should consider the following factors: "the characteristics of the accused, such as his experience, background, and education; the conditions of the interrogation; and the conduct of law enforcement officials, notably, whether there was physical abuse, the period of restraint in handcuffs, and use of psychologically coercive tactics." *Nelson v. Walker*, 121 F.3d 828, 833 (2d Cir.1997) (citing *Green v. Scully*, 850 F.2d 894, 901 (2d Cir.1988)). No single factor, however, determines whether a defendant's statement was voluntary. *See id.*

The government argues that this Court need not hold a suppression hearing to determine the voluntariness of Awadallah's statements because his allegations "fail to raise a legitimate issue concerning the voluntariness of his statements." Gov't Mem. at 49. In support of this argument, the government relies upon a number of cases in which the statements of hospitalized defendants were held to be voluntary because they were alert and mentally competent when questioned. *See* Gov't Mem. at 46–47 (citing *United States v. Khalil*, 214 F.3d 111 (2d Cir.), *cert. denied*, 531 U.S. 937, 121 S.Ct. 326, 148 L.Ed.2d 262 (2000); *Pagan v. Keane*, 984 F.2d 61 (2d Cir.1993); *Campaneria v. Reid*, 891 F.2d 1014, 1020 (2d Cir.1989)). Likewise, the government argues, Awadallah was alert and mentally competent when the FBI agents questioned him.

What the government ignores, however, is that each of these cases involved a review of the lower court's decision that the defendant's statements were, in fact, voluntary. Those lower courts made their decisions *after* holding an evidentiary hearing. *See Khalil*, 214 F.3d at 121–22; *Pagan*, 984 F.2d at 63; *Campaneria*, 891

F.2d at 1019–20. Because the only question before the Second Circuit was whether the lower courts' factual findings were clearly erroneous or whether there was an error of law, *see, e.g., Khalil*, 214 F.3d at 121–22, these cases have little bearing on whether Awadallah is entitled to an evidentiary hearing.

Moreover, as the Supreme Court explained in a case where it held a hospital interrogation *was* coerced, "[d]etermination of whether a statement is involuntary 'requires more than a mere color-matching of cases.' It requires careful evaluation of all the circumstances of the interrogation." *Mincey v. Arizona*, 437 U.S. 385, 401, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978) (quoting *Reck v. Pate*, 367 U.S. 433, 442, 81 S.Ct. 1541, 6 L.Ed.2d 948 (1961)). Given the limited value of "color-matching cases," the cases cited by the government are clearly inapposite as to whether Awadallah's statements were "the product of his free and rational choice." *Greenwald v. Wisconsin*, 390 U.S. 519, 521, 88 S.Ct. 1152, 20 L.Ed.2d 77 (1968).

Awadallah does not allege that he suffered any physical abuse or that he was physically restrained prior to speaking with the agents on September 20, 2001. But the allegations still suggest that he may have been the victim of coercion and intimidation. Twenty FBI agents surrounded him on the street and then refused him permission to return to his own home, call his brother, or drive to the FBI office. The agents also told him that he would not be released unless he took a polygraph test. These allegations—in addition to Awadallah's youth, inexperience with law enforcement officials, and limited English capabilities—make it quite possible that his "will was overborne" by the interrogating agents. *Haynes v. Washington*, 373 U.S. 503, 513, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963).

## C. The Applicability of the Exclusionary Rule

 "When evidence is obtained in violation of the Fourth Amendment, the judicially developed exclusionary rule usually precludes its use in a criminal proceeding against the victim of the illegal search and seizure." *Illinois v. Krull*, 480 U.S. 340, 347, 107 S.Ct. 1160, 94 L.Ed.2d 364 (1987). The primary purpose of the exclusionary rule is not to cure the harm done to the defendant, but rather to deter police from violating the constitutional rights of individuals throughout the community. *See id.* at 347, 107 S.Ct. 1160; *Elkins v. United States*, 364 U.S. 206, 217, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960) ("The rule is calculated to prevent, not to repair.").

There are exceptions to this rule. At times, courts permit the government to present illegally obtained evidence. "[T]his occurs in rather special circumstances in which . . . the deterrence objective of the exclusionary rule would not be served by suppression and where some other important value would be substantially furthered by admission of the evidence." Wayne R. LaFave, 5 *Search and Seizure: A Treatise on the Fourth Amendment* § 11.6 (3d ed. 1996 & Supp. 2002). As the Supreme Court has explained, "application of the exclusionary rule properly has been restricted to those situations in which its remedial purpose is effectively advanced." *Krull*, 480 U.S. at 347, 107 S.Ct. 1160.

The government argues that this case presents an exception to the exclusionary rule because the "pending charges [for perjury] are based solely on testimony given *after* the searches were conducted and the defendant's statement taken in San Diego." Gov't Mem. at 39 (emphasis in original). According to the government, the underlying goal of deterrence would presumably not be served because the "exclusionary rule does not require suppression of evidence, even if illegally obtained, acquired *before* the conduct forming the basis for the charged offenses." *Id.* (emphasis added).

The Second Circuit rejected this argument in *United States v. Ceccolini*, 542 F.2d 136 (2d Cir.1976), *rev'd on other grounds*, 435 U.S. 268, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978). In *Ceccolini*, the Second Circuit considered two issues. The first issue was whether a witness's testimony was the product of a concededly unlawful search. *See* 542 F.2d at 140 n.5, 141–42. The Second Circuit held that the testimony was tainted by the unlawful search because "the road to [the witness's] testimony from . . . [the] concededly unconstitutional search [was] both straight and uninterrupted." *Id.* at 142.[31]

The second issue was whether "the rule excluding the fruit of an illegal search is inappropriate in a perjury prosecution, especially when the perjury occurred *after* the illegal intrusion." *Id.* (emphasis added). "[T]he Government contend[ed] that suppression serve[d] no deterrent purpose when the search precedes the crime and that perjury cannot be condoned in any event." *Id.* Although "fully in sympathy

---

**31.** The Supreme Court ultimately reversed this holding on the ground that "the Court of Appeals erred in holding that the degree of attenuation was not sufficient to dissipate the connection between the illegality and the testimony." *Ceccolini*, 435 U.S. at 279, 98 S.Ct. 1054. The Court emphasized that (1) the witness's testimony was voluntary and in no way coerced or induced by the unlawful seizure; (2) the government did not use the unlawfully obtained evidence in questioning the witness; (3) substantial periods of time elapsed between the illegal search and the initial interview with the witness and the testimony at trial; and that (4) the FBI might have eventually interviewed the witness in any event. *See id.* at 279–80, 98 S.Ct. 1054.

with the Government's plea that perjury not be condoned," the Second Circuit nonetheless rejected this contention, finding "no sufficient basis for distinguishing trials of perjury charges from trials on charges of other serious crimes to which the exclusionary rule would apply in the Government's direct case at trial." *Id.* "If the Government's position were accepted, then logically the exclusionary rule would also be nullified for any crime that occurred after the illegal search." *Id.* Because "[the Second Circuit] disagree[d] with the Government's contention that the exclusionary rule serves no purpose here . . . . it was proper to suppress [the fruit of an illegal search] in this perjury prosecution." *Id.* at 143.[32]

Even if *Ceccolini* had not squarely decided the issue now raised by the government, the result would be compelled by Supreme Court precedent. The exclusionary rule "has primarily rested on the judgment that the importance of deterring police conduct that may invade the constitutional rights of individuals *throughout the community* outweighs the importance of securing the conviction of the specific defendant on trial." *United States v. Caceres*, 440 U.S. 741, 754, 99 S.Ct. 1465, 59 L.Ed.2d 733 (1979) (emphasis added). Thus, the focus is not whether in that *particular* case the marginal deterrence gained through suppression outweighs the importance of upholding the law. Indeed, the exclusionary rule would never apply if this were the analysis because the seriousness of the crime will always outweigh the value of deterrence that would have been gained in a particular case.[33]

Rather, a court must determine whether the exclusionary rule, if applied to those types of cases in general, will deter the police from violating "the constitutional rights of individuals throughout the community." *Caceres*, 440 U.S. at 754, 99 S.Ct. 1465. Courts must not forget that "there are many unlawful searches of homes and automobiles of innocent people which turn up nothing incriminating, in which no arrest is made, about which courts do nothing, and about which we never hear." *Elkins*, 364 U.S. at 217–18, 80 S.Ct. 1437 (quoting *Brinegar v. United States*, 338 U.S. 160, 181, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949) (Jackson, J., dissenting)). "Courts can protect the innocent against such invasions only indirectly and through the medium of excluding evidence obtained against those who frequently are guilty." *Id.* at 218, 69 S.Ct. 1302 (quotation marks omitted).

Suppressing evidence that the police seized during an illegal search in the pros-

---

**32.** The Supreme Court did not reach the second issue in *Ceccolini* (*i.e.*, whether the exclusionary rule can apply to charges of perjury that happened after the evidence was unlawfully obtained) because its reversal on the ground of attenuation was dispositive. Nonetheless, *Ceccolini*'s other holdings remain good law in this circuit, *see, e.g., United States v. Lynch* 716 F.Supp. 96, 98 (S.D.N.Y.1989) (citing *Ceccolini*), because a panel fully considered and decided those issues.

**33.** For example, in our "constitutional process of securing a witness' testimony, perjury simply has no place whatever." *United States v. Mandujano*, 425 U.S. 564, 576, 96 S.Ct. 1768, 48 L.Ed.2d 212 (1976). But recogniz-

ing this fact does not help this Court answer the question of whether suppressing the evidence in a perjury case will deter the police from violating the Constitution. It is also true, for example, that rape and drug-dealing have no place in our society. Yet, the Supreme Court has shown no hesitancy in suppressing evidence in cases charging these crimes. *See, e.g., Miranda v. Arizona*, 384 U.S. 436, 492, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) (overturning the conviction of a man who confessed to kidnaping and raping an 18–year old woman); *Wong Sun*, 371 U.S. at 484–89, 491–93, 83 S.Ct. 407 (overturning conviction of two men who confessed to using heroin).

ecution of a perjury trial *directly related* to that seizure clearly deters the police from violating the Constitution. The police are not myopic—they realize that prosecutors will often bring charges of perjury if the opportunity arises. The police know that everything discovered in their search can and will be used against the defendant or target witness in a court of law. Indeed, from the perspective of the police or prosecutor, a conviction for perjury is often as good as a conviction for the crime being investigated.[34] Such was the case in *Ceccolini*, for example, where a defendant was suspected of illegal gambling but because there was insufficient evidence to prove this charge, he was indicted for perjury. *See Ceccolini*, 542 F.2d at 138 n. 2.

In its opposition papers, the government does not refer to *Ceccolini*. Instead, the government argues that this case is controlled by *United States v. Varela*, 968 F.2d 259 (2d Cir.1992), a case in which the court declined to suppress unlawfully obtained evidence in the context of a perjury charge. *See* Gov't Mem. at 40–42. A review of the facts of *Varela* as well as its underlying rationale shows why *Varela* is not controlling.

In *Varela*, federal agents illegally arrested Carlos Varela and several of his acquaintances for trafficking in cocaine. *See* 968 F.2d at 260. While in custody, "Varela spoke with federal agents and in the process incriminated himself [and the other individuals]." *Id.* at 260–61. A court subsequently suppressed these statements as the fruit of an unlawful arrest and dismissed the indictment. *See id.* at 261.

Two months later, Varela was subpoenaed to testify before a grand jury investigating his alleged co-conspirators. *See id.*

at 261. When he asserted his Fifth Amendment rights, the government granted him immunity from prosecution. *See id.* Despite his immunity, Varela denied having stated that his acquaintances were involved in cocaine trafficking, which directly contradicted the statement he made when he was illegally arrested. *See id.* "Varela was subsequently tried for and convicted of endeavoring to influence, obstruct, or impede a grand jury and of making false declarations to a grand jury." *Id.*

On appeal, Varela argued that his statements should be suppressed again in his prosecution for perjury. The Second Circuit disagreed. Holding that the illegally obtained statements could be admitted at the perjury trial, the court explained that the deterrent benefit of the exclusionary rule did not outweigh the cost that excluding the evidence would impose. *See id.* at 260. In order for there to be any benefit, "we would have to make the unlikely assumption that when the [federal] agents arrested Varela unlawfully and solicited his cooperation, they were motivated in part by the belief that Varela would later choose to lie to a grand jury," which was investigating his alleged co-conspirators two months later. *Id.* at 262. This assumption was unsupportable because, at the time of Varela's unlawful arrest, the possibility that he would later commit perjury before a grand jury after his statements had been suppressed and he had been granted immunity was "too remote to serve as a motivating factor." *Id.*

"On the other side of the balance," excluding the statements "would come at a cost to the truth-seeking process." *Id.* at 263. Of course, part of this cost is borne

---

34. "Since the subject matter of the inquiry is crime ... it is unrealistic to assume that all of the witnesses capable of providing useful information will be pristine pillars of the community untainted by criminality." *Mandujano*, 425 U.S. at 573, 96 S.Ct. 1768.

by society in every case in which a court suppresses evidence. But in *Varela*, there was an additional fact that made the cost higher than usual: By the time Varela gave his immunized but perjurious testimony, a court had *already* determined that his prior statements were obtained unlawfully. *See id.* at 261, 263. The court reasoned that if a defendant knew that the government could *never* use his prior statements against him, "suppression of such statements would, in effect, convert the exclusionary rule into a license to commit perjury." *Id.* at 263. When the court balanced the benefits of exclusion against its costs, it determined that "the additional marginal deterrence achieved by excluding Varela's [illegally obtained] statement in his perjury trial [did] not outweigh the societal benefit from permitting the use of the statement in this context." *Id.* at 262.

As the government correctly notes, other federal courts have reached the same conclusion as *Varela*—refusing to suppress illegally obtained evidence in perjury cases when a court has already suppressed it in the original prosecution. *See United*

*States v. Turk*, 526 F.2d 654 (5th Cir.1976); *United States v. Raftery*, 534 F.2d 854 (9th Cir.1976).[35] As in *Varela*, these cases reasoned that suppression would yield a negligible benefit while increasing the incentive for defendants to lie in subsequent proceedings. *See Raftery*, 534 F.2d 854 (9th Cir.1976) ("The deterrent effect of excluding the evidence resulting from the illegal search would be minimal. . . . The purpose of the rule would not be served by forbidding the Government from using the evidence to prove the entirely separate offense of perjury before a [federal] grand jury occurring *after the illegal search and seizure and suppression of the evidence in the state court.*" (emphasis added)); *Turk*, 526 F.2d at 667 ("When the Government is effectively denied the possibility of direct prosecution on the basis of illegally seized evidence, no significant additional deterrent effect could be realized by suppressing the evidence at a trial of the search victim for a crime committed *after the illegal search and with the knowledge that the illegal search occurred.*" (emphasis added)).

**35.** In *United States v. Finucan*, 708 F.2d 838 (1st Cir.1983), cited by the government, *see* Gov't Mem. at 43, the First Circuit *affirmed* a district court's decision to *suppress* evidence as it related to a perjury charge. In that case, the government charged the defendant with mail fraud, violating the Motor Vehicle Information and Cost Savings Act and committing perjury during the investigation. *See Finucan*, 708 F.2d at 841. The district court suppressed the evidence as the fruit of an unlawful seizure. *See id.* at 841. On appeal, the government argued that the evidence should not be suppressed with regard to the perjury charge. *See id.* at 845. The First Circuit agreed with the reasoning of *Turk* and *Raftery*, but held that suppression was warranted because "the suppression order as to the [other] counts would be meaningless if the suppressed evidence could be presented to the same jury as part of the government's perjury case." *Id.* In *dicta*, the court stated: "Were the government to request a severed trial and

the district court to grant it, or were the government to proceed only on the perjury counts, there would cease to be any proper reason to withhold this evidence." *Id.* at 846.

*Finucan*, however, is factually distinguishable on two grounds. *First*, by suppressing the evidence related to the primary crimes (*e.g.*, mail fraud), the police *were* punished and thereby deterred from committing future violations. In this case, there will be no punishment for any unlawful actions if there is no suppression. *See, e.g., Raftery*, 534 F.2d at 857 ("The purpose of the exclusionary rule was satisfied when the state officials were forbidden to use the illegally obtained evidence to prove the narcotics offenses"); *Turk*, 526 F.2d at 667 (emphasizing that the government had already been "denied the possibility of direct prosecution."). *Second*, the police in *Finucan* had far less reason to anticipate that the accused would give false testimony than the FBI agents here.

The problems raised in *Varela* are not an issue here. *See Ceccolini*, 542 F.2d at 143 ("[T]his is not a case, such as *Raftery* or *Turk*, in which an immunized witness was aware of an illegal search and thereupon made use of that knowledge to perjure himself with impunity .... [and] we disagree with the Government's contention that the exclusionary rule serves no purpose here."). *First*, the perjury charges against Awadallah arise directly out of the FBI's investigation. The seizures were not so remote from the crime with which Awadallah was eventually charged that no deterrence value would be served. When the police are investigating a *material witness* (as opposed to an alleged criminal), perjury is always foreseeable. The one thing that the police can expect from a witness is for him to testify before a grand jury, which in turn may result in perjury.

*Second*, no court has determined whether the agents did, in fact, illegally seize Awadallah's property. When Awadallah appeared before the grand jury, he had every incentive to testify truthfully and in a manner consistent with his prior interviews. The *possibility* of suppression does not give anyone a "license to commit perjury" just as the possibility of suppression (based on the hope that the police will act illegally) does not give anyone an incentive to commit a crime. Indeed, unlike the defendant in *Varela*, Awadallah testified *consistently* with his statements to the agents, not inconsistently.

## D. Should the Grand Jury Testimony Be Suppressed?

 Defendant has urged, albeit somewhat generally, that this Court exercise its supervisory power. *See* Berman Aff. ¶¶ 13, 28. The next question, then, is whether the exercise of that power would permit suppression of the grand jury testimony resulting in the effective dismissal of the perjury charges. *See United States v. Jacobs*, 547 F.2d 772, 774–76, 778 (2d Cir. 1976) (exercising supervisory power to suppress perjured grand jury testimony and dismissing the indictment for perjury).

Although "[a] grand jury's investigation is not fully carried out until every available clue has been run down and all witnesses examined," *United States v. Stone*, 429 F.2d 138, 140 (2d Cir.1970), "the powers of the grand jury are not unlimited and are subject to the supervision of a judge." *Branzburg v. Hayes*, 408 U.S. 665, 688, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972). "Judicial supervision of the administration of criminal justice in the federal courts implies the duty of establishing and maintaining civilized standards of procedure and evidence." *McNabb*, 318 U.S. at 340, 63 S.Ct. 608.

"[G]uided by considerations of justice, and in the exercise of supervisory powers, federal courts may, within limits, formulate procedural rules not specifically required by the Constitution or the Congress." *Hasting*, 461 U.S. at 505, 103 S.Ct. 1974 (quotation marks and citation omitted). "The purposes underlying use of the supervisory powers are threefold: to implement a remedy for violation of recognized rights; to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before the jury; and finally, as a remedy designed to deter illegal conduct." *Id.* (citations omitted).

In their totality, Awadallah's allegations might require this Court to exercise its supervisory power. Awadallah may be able to prove that he was unlawfully arrested, unlawfully searched, abused by law enforcement officials while in prison, denied access to his lawyer and family, and denied an acceptable diet. In addition, his grand jury testimony may have had an illegitimate purpose and may have been

conducted under unusually harsh conditions—testifying while shackled to a chair.

All of this occurred while Awadallah was held as a material witness—*not* as a defendant accused of criminal conduct. Even putting to one side the other allegations previously mentioned, Awadallah's twenty-day detention deserves further scrutiny because the government may have failed to comply with the statute that grants it the authority to detain a material witness. Section 3144 provides in pertinent part:

> No material witness may be detained because of inability to comply with any condition of release *if the testimony of such witness can adequately be secured by deposition*, and if further detention is not necessary to prevent a failure of justice. Release of a material witness may be delayed for a reasonable period of time until the deposition of the witness can be taken pursuant to the Federal Rules of Criminal Procedure.

18 U.S.C. § 3144 (emphasis added). Under the plain language of the statute, the government must show why the witness should not be released, with or without the taking of his deposition.[36] The record as developed thus far shows no indication that the government attempted to take Awadallah's deposition or offered to explain why it would not have been feasible—even though Awadallah's counsel made the offer to have Awadallah deposed. *See* 9/25/01 Det. Tr. at 52. A hearing is therefore required to determine whether such efforts were made or the reasons why they were not.

In sum, whether Awadallah's allegations are true and whether the resulting grand jury testimony may now be used against him is a question that must be considered.

## VII. REMAINING MOTIONS THAT DO NOT REQUIRE A HEARING

Awadallah has made two final motions should this case proceed to trial. *First*, he claims that the perjury counts are duplicative and, therefore, the second one should be dismissed. *Second*, he argues that certain material from the Indictment should be stricken as highly prejudicial and inflammatory.

### A. Are the Perjury Counts Duplicative?

██ Awadallah claims that the allegedly false statements underlying Count Two, which charges that he lied about his handwriting in the exam booklet, are "immaterial, and ... a redundant and duplicative repetition of what is alleged in Count One." Berman Aff. ¶ 32. The contention that the allegedly false statements are immaterial is a question of fact for the jury to decide. *See Johnson v. United States,* 520 U.S. 461, 465, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997); *see also* Leonard B. Sand et al., *Modern Federal Jury Instructions* (Criminal), Inst. 48–10 and comment and Inst. 48–24. In contrast, the claim that the charges are duplicative may serve as a ground for dismissing Count Two.

When the proof required to convict on one count "necessitate[s] the establishment of different facts," the charges are not multiplicitous. *United States v. Doulin,* 538 F.2d 466, 471 (2d Cir.1976). In this case, to prove defendant's guilt on Count Two, a jury would be required to find that Awadallah wrote all of the words in his

---

**36.** "This conforms to the policy of the federal material witness statute, as reported in its legislative history: 'However, the Committee stresses that whenever possible, the depositions of such witnesses should be obtained so that they may be released from custody.'" Stacey M. Studnicki, "Material Witness Detention: Justice Served or Denied?," 40 *Wayne L.Rev.* 1533, 1539 n.37 (1994) (quoting 1984 U.S.C.C.A.N. 3211–12).

exam booklet. Because such proof is not required to prove defendant's guilt on Count One, the counts may not be dismissed on the ground that they are multiplicitous.

## B. Motion to Strike Surplusage

■ Awadallah moves to strike, as surplusage, certain material contained in the "Background" section of the Indictment because it is highly prejudicial and inflammatory. Defendant argues that this material has no probative value whatsoever and it will inflame the jury's passion. *See* Berman Aff. ¶ 33. The government responds that courts should not "tamper[] with indictments" and should only strike allegations that "are not relevant to the crime charged and are inflammatory and prejudicial." Gov't Mem. at 57 (quoting *United States v. Bin Laden*, 91 F.Supp.2d 600, 621 (S.D.N.Y.2000) and *United States v. Mulder*, 273 F.3d 91, 99 (2d Cir.2001)).[37]

First, Awadallah seeks to strike almost all of the "Background" section of the Indictment, which explains the initiation of a federal grand jury investigation into the terrorist attacks of September 11, 2001. *See* Berman Aff. ¶ 35. Because the Government bears the burden of proving the materiality of defendant's allegedly false statements, the background of the grand jury's investigation is relevant to the charge and is not surplusage. *See United States v. Carey*, 152 F.Supp.2d 415, 429 (S.D.N.Y.2001)("Without discussing the purpose of the various interrogations, it would be impossible to determine whether [the defendant's] allegedly false testimony was material.").

■ Awadallah's other two requests have more merit. He asks the Court to strike the references to three videotapes found in his car and to certain computer-generated photographs found in his apartment, both of which are found at paragraph six of the Indictment. Two of the videotapes concern the 1993 war in Bosnia and the other concerns the Koran. The photographs are of Osama bin Laden. It is beyond cavil that this material is highly inflammatory when our country is currently engaged in a war against terrorism in Afghanistan, a prime purpose of which is to arrest Osama bin Laden. Moreover, the material has no relevance to the narrow perjury charges of this Indictment.

The government has not specifically addressed this material. Rather, it asserts the general proposition that the information known to the grand jury at the time defendant testified is relevant to the charges. *See* Gov't Mem. at 57–58. The trial jurors, however, have no power to upset the grand jury's decision to return an indictment and they need not pass on whether the grand jury had sufficient information before it to warrant the return of an indictment. Thus, as a general proposition, the trial jury does not need to know *all* of the information that was before the grand jury at the time defendant testified.[38] Because the challenged material is not relevant to the crime charged, and it is inflammatory and prejudicial, it is hereby stricken.

## VIII. CONCLUSION

To summarize:

---

37. Awadallah also asks that the question and answer that make up subparagraph 11(e) of Count One be stricken because the answer is literally true. *See* Berman Aff. ¶ 37. The government agrees to this request. *See* Gov't Mem. p. 59 n. 13.

38. Indeed, in all probability, the government will not reveal to the trial jury, or to this Court, *all* of the information known to the grand jury at the time it returned an indictment against Awadallah.

1. The motion to dismiss the Indictment on the ground of recantation is denied.

2. The motion to dismiss the Indictment on the ground that the government violated the Vienna Convention on Consular Relations is denied.

3. The motion to dismiss the Indictment on the ground that the government interfered with defendant's right to counsel is denied.

4. Defendant's motion to dismiss the second count of perjury as duplicative is denied.

5. Defendant's motion to strike portions of the Indictment as surplusage is denied in part and granted in part.

6. Defendant's motion for a suppression hearing is granted.

7. Defendant's motions to dismiss the Indictment for violations of due process as well as under this Court's supervisory power is reserved until after the hearing.

A suppression hearing is scheduled for February 15, 2002, at 10:00 a.m.